**BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, Plaintiff,**

v.

**CSX TRANSPORTATION, INC., Defendant.**

Civ. A. No. 286–243.

United States District Court, S.D. Georgia, Brunswick Division.

June 16, 1987.

William G. Mahoney, Washington, D.C., John R. Ferrelle, Brunswick, Ga., for plaintiff.

Malcolm R. Maclean, Savannah, Ga., James S. Whitehead, Chicago, Ill., for defendant.

ORDER

ALAIMO, Chief Judge.

In this action, the Brotherhood of Railway, Airline and Steamship Clerks, Freight

Handlers, Express and Station Employees ("BRAC") seeks to enjoin defendant, CSX Transportation, Inc. ("CSX"), from closing its heavy freight car repair shop in Waycross, Georgia, and transferring the employees and repair work from Waycross to another shop located in Raceland, Kentucky. In essence, BRAC contends that the shop transfer constitutes a change in the terms and conditions of employment for Waycross employees which may not be unilaterally imposed by CSX without complying with the mediation procedures required by the Railway Labor Act, 45 U.S.C. §§ 152 Seventh, 156 ("RLA"). Defendant has moved to dismiss or, in the alternative, for summary judgment on BRAC's complaint seeking a declaratory judgment and injunctive relief. In response, BRAC has cross-moved for partial summary judgment.

Since the Interstate Commerce Commission ("ICC") is empowered by 49 U.S.C. § 11341 to exempt certain transactions from "all other law ... as necessary to ... carry out the transaction," and since, in 1980, the ICC approved CSX's acquisition of control over the railroads which formerly had independently operated these repair shops, the Court is of the opinion that the shop transfer is exempt from the application of the RLA and, accordingly, BRAC is not entitled to the relief it seeks. Plaintiff's petition for a preliminary injunction will, therefore, be denied and the remainder of its complaint dismissed for failure to state a claim on which relief can be granted. In addition, plaintiff's cross-motion for partial summary judgment will be denied.

This case has taken a procedurally serpentine course and has required the application of distinct bodies of law which, at best, must be characterized as "in tension." The unusually complicated posture of this case and the unsettled nature of the applicable law merit a detailed explanation, which the Court will attempt to provide by way of the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. The Interstate Commerce Commission, by order of September 23, 1980, approved an application of the CSX Corporation to acquire control of the railroad subsidiaries of Chessie System, Inc. ("Chessie"), and Seaboard Coast Line Industries, Inc. ("SCLI"). As a result of this transaction, CSX was the surviving partner of a merger between Chessie and SCLI. Chessie, until that time, had controlled the Chesapeake and Ohio Railway Company ("C & O"), which operated a heavy freight car repair shop at Raceland, Kentucky. At that time, SCLI controlled the Seaboard Coast Line Railway Company ("Seaboard"), which then operated its heavy freight car repair shop at Waycross, Georgia. The ICC authorized Chessie and SCLI to merge into CSX, while their individual railroad subsidiaries, such as C & O and Seaboard, were to remain separate corporate entities. In order to protect carrier employees affected by the consolidation, "as well as those who may be affected in the future, but are not now identified specifically," the ICC imposed the so-called *"New York Dock"* conditions. Employees affected by actions of their employer taken pursuant to the ICC's authorization are entitled to the protections embodied in the *New York Dock* conditions. *CSX—Control—Chessie and Seaboard C.L.I.,* 363 I.C.C. 521 (1980); *see also New York Dock Ry. v. U.S.,* 609 F.2d 83 (2d Cir.1979).

2. Article I, Section 4(a) of the *New York Dock* conditions provides that a carrier proposing to take an action pursuant to the ICC's authorization that may cause the dismissal or displacement of its employees must give its employees at least 90 days written notice. If the parties are unable to reach agreement on the implementation of the proposed action, either party may submit the dispute to binding arbitration before a neutral referee.

3. On August 29, 1986, CSX served a formal notice under Article I, Section 4 of the *New York Dock* conditions that it intended to close the Waycross heavy repair shop and transfer the employees and the work that otherwise would be performed there to the C & S heavy repair shop in Raceland, Kentucky. The notice stated that 149 job positions at Waycross would

be abolished (121 occupied by BRAC members) and that 107 new job positions would be created at Raceland (99 in crafts represented by BRAC) to perform the work that would be transferred from Waycross. Thus, the notice informed BRAC that the Waycross shop would be closed and that, by January of 1987, 22 BRAC-represented jobs would be lost.

4. After attempts to negotiate an implementing agreement on the transfer were unsuccessful, BRAC requested on October 10, 1986, that the dispute be referred to binding arbitration under the *New York Dock* conditions, as well as under a provision of a collective bargaining agreement governing Seaboard employees who were employed in 1967. That agreement, due to the color of its cover, is known as the "Orange Book" agreement. On October 15, 1986, CSX also called for arbitration under the *New York Dock* conditions. BRAC later challenged the applicability of the *New York Dock* conditions, contending in a letter of November 2, 1986, that the closing of the Waycross shop and the transfer to Raceland had not been authorized by the ICC in the *CSX—Control* case and, therefore, were not subject to compulsory arbitration under the *New York Dock* conditions.

5. On December 17, 1986, BRAC filed this action for declaratory judgment and injunctive relief, alleging that the closing of the Waycross shop and transfer of the work to Raceland, Kentucky, constituted a unilateral modification of existing rules and working conditions in violation of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 152 Seventh and 156. BRAC also sought a declaratory judgment that CSX's attempt to effectuate the transfer through compulsory arbitration violated the arbitration procedures set forth in § 157 First of the RLA. Finally, BRAC sought preliminary and permanent injunctive relief to protect employees from harm pending exhaustion of the mandatory notice, negotiation and mediation procedures of the RLA. 45 U.S.C. §§ 155–157, 160.

6. On December 18, 1986, a hearing was held before the arbitration committee pursuant to the *New York Dock* conditions. CSX and BRAC addressed a variety of issues to the committee, including: whether the transfer could be undertaken pursuant to the ICC's authorization; whether CSX had given BRAC sufficient notice of the transfer; whether the Seaboard employees protected by the "Orange Book" could be transferred off of Seaboard property in alleged derogation of that agreement; whether the work covered by the Seaboard collective bargaining agreement could be made subject to a C & O agreement; and what the ultimate terms of an implementing agreement should be.

7. On December 26, 1986, CSX posted a notice that the jobs of 21 employees at the heavy repair shop in Waycross would be abolished effective January 2, 1987, and BRAC sought a temporary restraining order ("TRO") in this Court to enjoin the proposed job abolishments. The Court denied BRAC's request for a TRO following a hearing on December 31, 1986, and scheduled a hearing on BRAC's motion for a preliminary injunction on January 9, 1987.

8. At the hearing on January 9, 1987, CSX presented evidence that the furloughs of January 2, 1987, were not caused by the impending shop transfer but, rather, were a result of a decline in the amount of available work scheduled for Waycross in 1987. BRAC showed that CSX failed to provide specific information in August of 1986 as to the nature of the work that was intended to be transferred to Raceland. Representatives of CSX testified that the decision to close the Waycross shop was made pursuant to a variety of considerations, including the following: that CSX's freight car repair costs are too high; that CSX has an over-capacity of repair facilities; and that the Raceland shop has superior technical and commercial potential. The testimony also showed that the repair work projected as available for Waycross in 1987 would have necessitated a reduction in force regardless of the plan to transfer the work to Raceland. Although evidence demonstrated that CSX had dismantled much of the Waycross shop's machinery and office materials and loaded them onto railroad cars during December of 1986,

CSX stated that it would not implement the transfer until it received a favorable decision from the arbitration committee granting CSX permission to implement the transfer. The evidence further demonstrated that some Waycross equipment had already been reassembled and put back into place and that a program of repair work to be performed in Waycross had begun. Finally, BRAC admitted that, if the arbitration committee rendered a decision favorable to BRAC, the need for a preliminary injunction would evaporate.

9. On March 23, 1987, the neutral member of the arbitration committee issued his decision, with both the union and the carrier representatives dissenting. The arbitrator found that, because the shop transfer was necessary to allow CSX to carry out the ICC-approved merger, it was exempt from the RLA. However, on finding that the transfer of the Orange Book employees was not necessary to the consummation of the merger, the arbitrator ruled the Orange Book-protected employees could not be compelled to accept positions in Raceland. CSX appealed this decision to the ICC on April 13, 1987; BRAC filed a cross-appeal on May 26, 1987.

10. On May 8, 1987, CSX filed a motion to dismiss or, in the alternative, for summary judgment addressing the merits of BRAC's complaint before this Court. After securing an enlargement of time in which to respond, BRAC responded to CSX's motion and cross-moved for partial summary judgment on June 9, 1987.

11. BRAC came before the Court once again on June 1, 1987, seeking a TRO to enjoin the shop transfer. This time BRAC contended that, if the transfer were to be implemented while the appeal of the arbitrator's decision to the ICC was still pending, those Orange Book employees who elected to stay in Waycross would run the risk of losing the present opportunity to bid on jobs in Raceland. Although the arbitrator held that Orange Book employees could not be compelled to move to Raceland, CSX's appeal of that decision presented the risk that the ICC would hold the reverse to be true. Such a situation would force Or-ange Book employees to face a dilemma: if they elected to stay in Waycross, they would be taking the chance that the ICC would later rule they could be moved to Raceland at a time when the bidding on Raceland jobs was over and the jobs filled by other workers. At a hearing before the Court on June 2, 1987, CSX stated that it would hold open positions in Raceland for any Orange Book-protected employees who might later desire to bid on Raceland jobs in the event that the arbitrator's decision is reversed. The Court granted BRAC's request for a TRO for a period of 10 days to preserve the status quo pending disposition of the various motions.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), as well as under 45 U.S.C. §§ 152 First, Seventh and 156, and under 49 U.S.C. § 11341. The case presents the federal question of whether CSX's proposed transfer of the employees and work at the Waycross repair shop to Raceland, Kentucky, constitutes a violation of the Railway Labor Act, 45 U.S.C. §§ 152, First and Seventh, and 156; or whether the proposed transaction is exempt from the application of the RLA due to the ICC's exercise of its exemption power under the Interstate Commerce Act, 49 U.S.C. § 11341(a).

2. Under the Railway Labor Act, a covered employer may not "change the rates of pay, rules, or working conditions of its employees ... except in the manner prescribed in such agreements or in Section 6 of this Act." 45 U.S.C. § 152 Seventh. BRAC contends that the proposed shop transfer constitutes the kind of unilateral "major change" which requires compliance with the voluntary mediation and arbitration provisions in 45 U.S.C. § 156. *See Elgin, Joliet & Eastern R. Co. v. Burley,* 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945). Once a showing has been made that the employer and the union are engaged in a "major" dispute over a proposed change in working conditions, the Court has the power to issue an injunction to prevent either party from altering the status quo until the RLA media-

tion process has been exhausted. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969). CSX contends that the proposed transfer is not a "major" change and that, even if it were, the requirements of the RLA have been superseded by the Interstate Commerce Act, 49 U.S.C. § 11341(a), to the extent that such requirements interfere with the implementation of a transaction approved by the ICC.

3. The Interstate Commerce Act confers on the ICC the authority to approve transactions with the following effect:

A carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust law or any other law, including state or municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.

49 U.S.C. § 11341(a). In addition, whenever the ICC approves of a proposed transaction, the ICC must require the carrier to "provide a fair arrangement ... protective of the interest of employees who are affected by the transaction." 49 U.S.C. § 11347.

4. In its order of September 23, 1980, the ICC approved of CSX's acquisition of control of the railroad subsidiaries of Chessie and SCLI and imposed the *New York Dock* conditions to protect the interests of labor affected by the transaction. The 1980 ICC order stated that the approved transaction "will enable CSX to consolidate control of two railroad systems which geographically meet end-to-end, with minor exceptions, and will enable the operation of single-system service connecting the East and Midwest with the Southeast." *CSX Corp.—Control, supra* at 529. The ICC expected resulting employee displacements to be short term and to occur only at points "where the basically end-to-end systems meet." However, the ICC also found that future coordinations might well be necessary to effectuate the full implementation of the approved transaction. For example,

the ICC stated: "It is certainly possible that as the two systems mesh their operations, additional coordinations may occur that could lead to further [employee] displacements." *Id.* at 589. The ICC ruled that the *New York Dock* conditions afforded employees adequate protections in the event of such future dislocations.

5. Invoking the *New York Dock* conditions, the parties entered into binding arbitration in order to reach an implementing agreement for the proposed shop transfer that would provide sufficient safeguards for the rights of affected employees. In his Opinion and Award of March 23, 1987, the neutral member of the arbitration committee, John B. LaRocco, found that the Raceland coordination "although not expressed in the control application ... is an approved transaction exempt from the Railway Labor Act." Arbitration Committee Award at 33. The arbitrator further recognized that "the exemption is only triggered when necessary," that is, where the RLA or the terms of existing collective bargaining agreements "thwart or substantially impede the approved transaction." *Id.*

6. Since BRAC contends that the proposed shop transfer violates the RLA, the Court must determine whether an exemption for the proposed shop transfer is "necessary to let [CSX] carry out the transaction." *I.C.C. v. Brotherhood of Locomotive Engineers, et al.,* — U.S. —, — n. 13, 107 S.Ct. 2360, 2377 n. 13, 95 L.Ed.2d (U.S.1987) (Stevens, J., concurring), *citing* 49 U.S.C. § 11341(a). The broad scope of the control application approved by the ICC in this case, which foresaw the need for "additional coordinations" as the two systems "mesh[ed] their operations," supports a finding that an exemption from the requirements of the RLA is necessary to permit the shop transfer and thereby carry out the approved transaction.

7. Under the law of this Circuit, the ICC "exceeds the scope of its authority when it voids contracts that are not germane to the success of the approved ... transaction." *City of Palestine, Texas v. United States,* 559 F.2d 408, 414 (5th Cir.

1977). The former Fifth Circuit, whose precedent binds this Court, reasoned that "Congress intended to empower the ICC to set aside state law restraints only insofar as necessary to assure the effectuation of the approved transactions." *Id.* at 415. This analysis comports with the interpretation of the Interstate Commerce Act adopted by Justice Stevens' concurring opinion in *I.C.C. v. Brotherhood of Locomotive Engineers, et al., supra,* an opinion which this Court considers dispositive of this case. Justice Stevens explained:

> [Section] 11341 [of the Interstate Commerce Act] automatically exempts a person from "other laws" whenever an exemption is "necessary to let that person carry out the transaction ..." 49 U.S.C. § 11341. The breadth of the exemption is defined by the scope of the approved transaction, and no explicit exemption is required to make the statute applicable.

*Id.* at —— ——, 107 S.Ct. at 2375.

8. After a painstaking review of all the documents in the record, the Court is of the opinion that, without an exemption pursuant to 49 U.S.C. § 11341, CSX would be unable to implement the proposed shop transfer, and the ICC-approved transaction could not be fully carried out. A reading of the ICC's order granting approval to CSX's control application yields a clear intention on the part of the ICC to permit CSX to consolidate the control of the C & O and Seaboard railroads in order to provide "single system service." Providing such service would not be possible if shop transfers such as the one proposed here were effectively prohibited by the application of the RLA. Although the ICC could not foresee every conceivable coordination resulting from the merger that would result in the displacement of employees, it granted approval of the merger with the proviso that the *New York Dock* conditions be applied to any future dislocations.

9. Having concluded that the proposed shop transfer *is* necessary to effectuate the CSX merger approved by the ICC, the Court finds that this transfer was exempted by the ICC from the application of the RLA and the relevant collective bargaining agreements. With reference to the Orange Book agreement, the Court considers that the arbitrator's finding that the Orange Book employees may not be compelled to move to Raceland has rendered moot BRAC's request for injunctive relief as it relates to Orange Book employees. For the purposes of this Order, however, the Court concurs with the findings made by the arbitrator on the issue of whether the transfer of the Orange Book employees was "necessary" in order to implement the approved transaction.

## CONCLUSION

In accordance with the preceding findings of fact and conclusions of law, BRAC's complaint for declaratory judgment and injunctive relief must be dismissed. Accordingly, BRAC's motion for a preliminary injunction and cross-motion for partial summary judgment are hereby DENIED. CSX's motion to dismiss or, in the alternative, for summary judgment is hereby GRANTED. The Clerk of the Court is directed to enter an appropriate judgment of dismissal.