William G. Mahoney, William J. Birney, Highsaw & Mahoney, Washington, D.C., for plaintiff-appellant.

Malcolm R. Maclean, Hunter, Maclean, Exley & Dunn, Savannah, Ga., James S. Whitehead, Sidley & Austin, Chicago, Ill., for defendant-appellee.

BROTHERHOOD RAILWAY CARMEN, DIVISION OF TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION (TCU), Plaintiff-Appellant,

v.

CSX TRANSPORTATION, INC., Defendant-Appellee.

No. 87–8466.

United States Court of Appeals, Eleventh Circuit.

Sept. 19, 1988.

Before HILL and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

Plaintiff-appellant Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees ("BRAC") commenced this lawsuit in federal district court seeking to enjoin defendant-appellee CSX Transportation, Inc. ("CSX"), a subsidiary of CSX Corporation, from implementing an arbitration award issued under procedures established by the

Interstate Commerce Commission ("ICC").[1] The district court denied BRAC's motion for a preliminary injunction and cross-motion for partial summary judgment; it granted CSX's motion to dismiss or, in the alternative, for summary judgment. BRAC appeals from that order. We conclude that the district court lacked subject matter jurisdiction; we therefore vacate the order of the district court and remand with instructions that the case be dismissed for lack of subject matter jurisdiction.

The district court found the following to be the facts of the case:

1. The Interstate Commerce Commission, by order of September 23, 1980, approved an application of the CSX Corporation to acquire control of the railroad subsidiaries of Chessie System, Inc. ("Chessie"), and Seaboard Coast Line Industries, Inc. ("SCLI"). As a result of this transaction, CSX was the surviving partner of a merger between Chessie and SCLI. Chessie, until that time, had controlled the Chesapeake and Ohio Railway Company ("C & O"), which operated a heavy freight car repair shop at Raceland, Kentucky. At that time, SCLI controlled the Seaboard Coast Line Railway Company ("Seaboard"), which then operated its heavy freight car repair shop at Waycross, Georgia. The ICC·authorized Chessie and SCLI to merge into CSX, while their individual railroad subsidiaries, such as C & O and Seaboard, were to remain separate corporate entities. In order to protect carrier employees affected by the consolidation, "as well as those who may be affected in the future, but are not now identified specifically," the ICC imposed the so-called *"New York Dock"* conditions. Employees affected by actions of their employer taken pursuant to the ICC's authorization are entitled to the protections embodied in the *New York Dock* conditions. *CSX [Corporation]—Control—Chessie [System, Inc.,] and Seaboard [Coast Line Industries, Inc.],* 363 I.C.C. 521 (1980); *see*

*also New York Dock Ry. v. U.S.,* 609 F.2d 83 (2d Cir.1979).

2. Article I, Section 4(a) of the *New York Dock* conditions provides that a carrier proposing to take an action pursuant to the ICC's authorization that may cause the dismissal or displacement of its employees must give its employees at least 90 days written notice. If the parties are unable to reach agreement on the implementation of the proposed action, either party may submit the dispute to binding arbitration before a neutral referee.

3. On August 29, 1986, CSX served a formal notice under Article I, Section 4 of the *New York Dock* conditions that it intended to close the Waycross heavy repair shop and transfer the employees and the work that otherwise would be performed there to the [C & O] heavy repair shop in Raceland, Kentucky. The notice stated that 149 job positions at Waycross would be abolished (121 occupied by BRAC members) and that 107 new job positions would be created at Raceland (99 in crafts represented by BRAC) to perform the work that would be transferred from Waycross. Thus, the notice informed BRAC that the Waycross shop would be closed and that, by January of 1987, 22 BRAC-represented jobs would be lost.

4. After attempts to negotiate an implementing agreement on the transfer were unsuccessful, BRAC requested on October 10, 1986 that the dispute be referred to binding arbitration under the *New York Dock* conditions, as well as under a provision of a collective bargaining agreement governing Seaboard employees who were employed in 1967. That agreement, due to the color of its cover, is known as the "Orange Book" agreement. On October 15, 1986, CSX also called for arbitration under the *New York Dock* conditions. BRAC later challenged the applicability of the *New York Dock* conditions, contending in a letter of November 2, 1986, that the closing of the

---

**1.** In order to avoid potential confusion, we wish to clarify that, consistent with the district court's order, we refer to the subsidiary corporation, CSX Transportation, Inc. as "CSX" rather than as "CSXT" as it was referred to by the parties in brief and at oral argument.

Waycross shop and the transfer to Race-land had not been authorized by the ICC in the *CSX—Control* case and, there-fore, were not subject to compulsory ar-bitration under the *New York Dock* con-ditions.

5. On December 17, 1986, BRAC filed this action for declaratory judgment and injunctive relief, alleging that the closing of the Waycross shop and transfer of the work to Raceland, Kentucky, constituted a unilateral modification of existing rules and working conditions in violation of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 152 Seventh and 156. BRAC also sought a declaratory judgment that CSX's attempt to effectuate the transfer through compulsory arbitration violated the arbitration procedures set forth in § 157 First of the RLA. Finally, BRAC sought preliminary and permanent in-junctive relief to protect employees from harm pending exhaustion of the manda-tory notice, negotiation and mediation procedures of the RLA. 45 U.S.C. §§ 155–157, 160.

6. On December 18, 1986, a hearing was held before the arbitration committee pursuant to the *New York Dock* condi-tions. CSX and BRAC addressed a varie-ty of issues to the committee, including: whether the transfer could be under-taken pursuant to the ICC's authoriza-tion; whether CSX had given BRAC suf-ficient notice of the transfer; whether the Seaboard employees protected by the "Orange Book" could be transferred off of Seaboard property in alleged der-ogation of that agreement; whether the work covered by the Seaboard collective bargaining agreement could be made subject to a C & O agreement; and what the ultimate terms of an implementing agreement should be.

7. On December 26, 1986, CSX posted a notice that the jobs of 21 employees at the heavy repair shop in Waycross would be abolished effective January 2, 1987, and BRAC sought a temporary restrain-ing order ("TRO") in this Court to enjoin the proposed job abolishments. The Court denied BRAC's request for a TRO following a hearing on December 31, 1986, and scheduled a hearing on BRAC's motion for a preliminary injunc-tion on January 9, 1987.

8. At the hearing on January 9, 1987, CSX presented evidence that the fur-loughs of January 2, 1987, were not caused by the impending shop transfer but, rather, were a result of a decline in the amount of available work scheduled for Waycross in 1987. BRAC showed that CSX failed to provide specific infor-mation in August of 1986 as to the na-ture of the work that was intended to be transferred to Raceland. Representa-tives of CSX testified that the decision to close the Waycross shop was made pur-suant to a variety of considerations, in-cluding the following: that CSX's freight car repair costs are too high; that CSX has an overcapacity of repair facilities; and that the Raceland shop has superior technical and commercial potential. The testimony also showed that the repair work projected as available for Waycross in 1987 would have necessitated a reduc-tion in force regardless of the plan to transfer the work to Raceland. Al-though evidence demonstrated that CSX had dismantled much of the Waycross shop's machinery and office materials and loaded them onto railroad cars dur-ing December of 1986, CSX stated that it would not implement the transfer until it received a favorable decision from the arbitration committee granting CSX per-mission to implement the transfer. The evidence further demonstrated that some Waycross equipment had already been reassembled and put back into place and that a program of repair work to be performed in Waycross had begun. Fi-nally, BRAC admitted that, if the arbitra-tion committee rendered a decision favor-able to BRAC, the need for a preliminary injunction would evaporate.

9. On March 23, 1987, the neutral mem-ber of the arbitration committee issued his decision, with both the union and the carrier representatives dissenting. The arbitrator found that, because the shop transfer was necessary to allow CSX to carry out the ICC-approved merger, it

was exempt from the RLA. However, on finding that the transfer of the Orange Book employees was not necessary to the consummation of the merger, the arbitrator ruled the Orange Book-protected employees could not be compelled to accept positions in Raceland. CSX appealed this decision to the ICC on April 13, 1987; BRAC filed a cross-appeal on May 26, 1987.

10. On May 8, 1987, CSX filed a motion to dismiss or, in the alternative, for summary judgment addressing the merits of BRAC's complaint before this Court. After securing an enlargement of time in which to respond, BRAC responded to CSX's motion and cross-moved for partial summary judgment on June 9, 1987.

11. BRAC came before the Court once again on June 1, 1987, seeking a TRO to enjoin the shop transfer. This time BRAC contended that, if the transfer were to be implemented while the appeal of the arbitrator's decision to the ICC was still pending, those Orange Book employees who elected to stay in Waycross would run the risk of losing the present opportunity to bid on jobs in Raceland. Although the arbitrator held that Orange Book employees could not be compelled to move to Raceland, CSX's appeal of that decision presented the risk that the ICC would hold the reverse to be true. Such a situation would force Orange Book employees to face a dilemma: if they elected to stay in Waycross, they would be taking the chance that the ICC would later rule they could be moved to Raceland at a time when the bidding on Raceland jobs was over and the jobs filled by other workers. At a hearing before the Court on June 2, 1987, CSX stated that it would hold open positions in Raceland for any Orange Book-protected employees who might later desire to bid on Raceland jobs in the event that the arbitrator's decision is reversed. The Court granted BRAC's request for a TRO for a period of 10 days to preserve the status quo pending disposition of the various motions.

District Court order of June 16, 1987, at 2–8, 662 F.Supp. 1409 (S.D.Ga.1987). The parties' appeal and cross-appeal to the ICC from the arbitration decision were decided by the ICC shortly before this case was orally argued in this court, although the decision was not served until after oral argument. *CSX Corporation—Control—Chessie System, Inc. and Seaboard Coast Line Industries, Inc.,* —— I.C.C.2d ——, Finance Docket No. 28905 (Sub-No. 22) and Finance Docket No. 21215 (Sub-No. 4) (decided June 8, 1988; served June 23, 1988).

While we do not dispute the district court's findings of fact, we must disagree with that court's conclusion that it had subject matter jurisdiction of this case. The district court found that it had jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), 45 U.S.C. §§ 152 First, 152 Seventh, and 156, and 49 U.S.C. § 11341, having concluded that

> [t]he case presents the federal question of whether CSX's proposed transfer of the employees and work at the Waycross repair shop to Raceland, Kentucky, constitutes a violation of the Railway Labor Act, 45 U.S.C. §§ 152, First and Seventh, and 156; or whether the proposed transaction is exempt from the application of the RLA due to the ICC's exercise of its exemption power under the Interstate Commerce Act, 49 U.S.C. § 11341(a).

District Court Order of June 16, 1987, at 8. However, we agree with CSX that this action is an attempt by BRAC to bypass the appropriate procedures for review of the arbitration award. Congress has provided for exclusive jurisdiction in the Court of Appeals to review actions by the ICC. 28 U.S.C. §§ 2321(a), 2342(5). The arbitration opinion and award recognizes that it is authoritative only as an extension of the authority of the ICC. R.2–22–App. A, at 31. We agree with CSX that the present lawsuit is, in effect, a collateral attack on the arbitration award; it is an attempt by BRAC to have the district court set aside the arbitration award, rather than going through the normal channels of appeal to the ICC and then to the Court of Appeals. Based upon the exclusive jurisdictional grant to the Court of Appeals by Congress,

we conclude that the district court lacks subject matter jurisdiction of this action.

Our decision does not totally preclude judicial review of this matter since, as noted above, the decision of the ICC is subject to direct review in the Court of Appeals. We believe our resolution of the case is consistent with the apparent intent of Congress in enacting the jurisdictional statutes providing for review of ICC decisions, and we note that our conclusion is in accord with the decision in *United Transportation Union v. Norfolk and Western Railway Co.*, 822 F.2d 1114 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988). *But see Railway Labor Executives Association et al. v. City of Galveston,* 849 F.2d 145 (5th Cir.1988).

BRAC argues that the ICC is required by 49 U.S.C. § 11347 to protect employees' existing collective bargaining rights, and that the ICC lacks the authority to determine the effect of its orders upon other laws. While these considerations may be relevant to the merits of the ultimate decision, they are not dispositive of the question whether the district court had subject matter jurisdiction of the case.

BRAC points us to the decision in *City of Palestine, Texas v. United States,* 559 F.2d 408 (5th Cir.1977), *cert. denied sub nom. Missouri Pacific Railroad Company v. City of Palestine, Texas,* 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978) and to Justice Stevens' concurrence in *Interstate Commerce Commission v. Brotherhood of Locomotive Engineers,* —— U.S. ——, 107 S.Ct. 2360, 2370, 96 L.Ed.2d 222 (1987), as further support for the proposition that there are limits on the ICC's power. However, the subject matter jurisdiction of the district court was not at issue in those cases, so we do not find them to be dispositive of the issue presently before us.

BRAC also argues that the present action cannot be viewed as a collateral attack on the arbitration award because the ICC lacks the district court's authority to determine the effect of its orders on other laws, such as the RLA. While we recognize that the "collateral attack" analogy is not perfect, we find it instructive; furthermore,

since the parties already have invoked the "direct appeal" procedure, we find no injustice or inefficiency in leaving the resolution of the decision in that forum. If anything, precluding the "collateral attack" will lead to a more efficient resolution of cases like this one, by eliminating duplication of effort.

As we conclude that subject matter jurisdiction is absent, we need not reach the merits.

The order of the district court is VACATED and the case is REMANDED to the district court with instructions to dismiss for lack of subject matter jurisdiction.