## RAILWAY LABOR EXECUTIVES' ASSOCIATION; International Association of Machinists, Aerospace Workers, International Brotherhood of Electrical Workers, Plaintiffs–Appellants,

v.

## SOUTHERN PACIFIC TRANSPORTATION COMPANY; Denver & Rio Grande Western Railroad Company, et al., Defendants–Appellees.

No. 91–16745.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1993.

Decided Oct. 21, 1993.

John O'B. Clarke, Jr., Highsaw, Mahoney & Clarke, P.C., Washington, DC, for plaintiffs-appellants.

Wayne M. Bolio, Southern Pacific Transp. Co., San Francisco, CA, for defendants-appellees.

Before: GOODWIN, HUG, and FLETCHER, Circuit Judges.

HUG, Circuit Judge:

Defendants-appellees, the Southern Pacific Transportation Company and a number of other railway carriers ("the Railroads") whose merger was approved by the Interstate Commerce Commission ("ICC"), sought to arbitrate the implementation of a plan coordinating their maintenance operations under the labor dispute resolution procedures imposed by the ICC in connection with that merger. Plaintiffs-appellants, the Railway Labor Executives' Association and other rail labor unions representing employees of these railroads ("the Unions"), commenced this lawsuit in federal district court seeking a declaration that they were not required to arbitrate under those procedures. The district court dismissed the action for lack of subject matter jurisdiction. We affirm.

I.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 1988, the ICC approved a proposal under which Rio Grande Industries ("RGI"), owner of the Denver Rio Grande Western Railroad Company, obtained control of the Southern Pacific Transportation Company and its subsidiary railroad companies. *See Rio Grande Industries, Inc., SPTC Holding Inc., and The Denver and Rio Grande Western Railroad Company—Control—Southern Pacific Transp. Co.,* Finance Docket No. 32000, 4 I.C.C.2d 834 (1988) (*"Rio Grande Control"*). When the ICC approves a railroad merger,[1] the ICC is required by 49 U.S.C. § 11347 to impose conditions for the protection of existing and future employees from the adverse effects of that merger. In this case, the ICC complied with section 11347 by imposing a standard set of conditions which it first enunciated in *New York Dock Railway—Control—Brooklyn Eastern Dist. Terminal,* 360 I.C.C. 60, 84–90 *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). *See Rio Grande Control,* 4 I.C.C.2d at 952–54. Under Article I, Section 4 of the so-called *"New York Dock* conditions," a merged or consolidated railroad which plans an operational change that may cause the dismissal or displacement of any employee must provide the employee and his union 90 days written notice. *New York Dock,* 360 I.C.C. at 85. If the carrier and the union cannot agree on the terms and conditions of an agreement which

---

1. The ICC recognized that RGI's acquisition of other railroads was not a "merger" in the strict sense but, nonetheless, chose to use that term interchangeably with "consolidation" or "acquisition." *See Rio Grande Control,* 4 I.C.C. at 837 n. 3. In this opinion, we have done the same.

implements this change, *either party* may submit the dispute to arbitration for an expedited "final, binding and conclusive determination." *Id.*

Proceeding under those provisions, the Railroads formally notified the Unions in June 1990 that they intended within 90 days "to coordinate light and running repair, the heavy maintenance of, and the scheduled testing and inspection of all [RGI system] locomotives among all SP–SSW–DRGW shop facilities where and as needed." Under existing practice, locomotives belonging to RGI subsidiary railroads were maintained only by the employees of the particular subsidiary to which the locomotive belonged. Under this arrangement, RGI subsidiaries have had to transport locomotives requiring maintenance or repair to one of their own facilities, even if the facility of another RGI subsidiary was closer. By coordinating its maintenance operations, RGI hopes to eliminate this practice and reduce the overall maintenance costs of its subsidiaries.

Between July 1990 and March 1991, the Railroads and the Unions discussed the maintenance coordination proposal but did not reach an agreement regarding its implementation. The principal stumbling block was a dispute over which set of procedures would govern the development of such an agreement. Proceeding on the assumption that the maintenance coordination plan was incident to the Rio Grande merger, the Railroads maintained that it should be implemented under the *New York Dock* procedures imposed in connection with that merger. Under these procedures, the Railroads could unilaterally invoke arbitration if the parties failed to reach an agreement. The Unions maintained that they could not be compelled to arbitrate. In their view, the maintenance coordination proposal was not incident to the merger, could not be implemented without the modification of existing bargaining agreements and, therefore, would have to be implemented—if at all—under the procedures prescribed by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.* The RLA generally governs the negotiation, enforcement, and modification of collective bargaining agreements between railroad carri-

ers and rail labor unions. Unlike the *New York Dock* procedures, the RLA provides that changes to an existing collective bargaining agreement may be arbitrated only with the mutual consent of *both parties.* 45 U.S.C. § 157. For this reason, the Unions maintained that arbitration of the dispute without their consent would violate their rights under the RLA.

The Railroads responded by arguing that under the Interstate Commerce Act ("ICA"), 49 U.S.C. § 11341(a), implementation of the maintenance coordination proposal was exempt from the procedures of the RLA. Section 11341(a) provides in relevant part that:

A carrier, corporation, or person participating in [an] approved or exempted transaction is exempt from the antitrust laws and from all other law, . . . as necessary to let that person carry out the transaction, hold, maintain, and operate property and exercise control or franchises acquired through the transaction.

49 U.S.C. § 11341(a) (1988). The Railroads argued that their proposal was "necessary to carry out" the Rio Grande merger and that it was therefore immune from the constraints of the RLA. To the contrary, the Unions maintained that changes in maintenance operations were not "necessary" to carry out the merger because the ICC had not contemplated such changes when it approved the Rio Grande merger.

By March 1991, it had become clear that the parties would not reach an implementation agreement. Consequently, over the objection of the Unions, the Railroads requested the National Mediation Board to appoint a neutral arbitrator and proceed to arbitrate the implementation of the maintenance coordination plan, pursuant to the *New York Dock* procedures. The Unions responded by filing the present action in the federal district court seeking a declaration that they could not be compelled to arbitrate and that the RLA procedures, not the *New York Dock* procedures, should apply. When the Unions sought to engage in pretrial discovery, the Railroads moved to stay discovery and to dismiss the suit for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1). The district court granted the mo-

tion to dismiss, concluding that under the Supreme Court's recent decision in *Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the ICC had exclusive authority over the matter. The Unions now appeal this order.

Notably, subsequent to the district court's order but prior to oral argument in this appeal, the Railroads went forward with arbitration proceedings against two appellant unions: the International Brotherhood of Electrical Workers ("IBEW") and the International Association of Machinists and Aerospace Workers ("IAM"). The IBEW participated in the arbitration, but reserved its right to later challenge the authority of the arbitration committee. The IAM refused to participate altogether. In April 1992, an arbitration committee issued an award against the IBEW, holding that the proposed maintenance consolidation proposal was incident to the Rio Grande merger, that the *New York Dock* procedures applied, and that the Railroads were entitled to implement their proposal under the terms last offered to the IBEW. In March, 1993, a neutral arbitrator issued essentially the same award against the IAM.

## II.

### STANDARD OF REVIEW

We review the existence of subject matter jurisdiction de novo. *Reebok Int'l v. Marnatech Enters., Inc.* 970 F.2d 552, 554 (9th Cir.1992).

## III.

### DISCUSSION

We begin our analysis of this case, as did the district court, with the Supreme Court's most recent opinion in the field of railway mergers, *Norfolk and Western Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("*Dispatchers*"). In *Dispatchers*, labor unions in two different cases challenged ICC orders that exempted parties to approved railway mergers from various provisions of their existing collective bargaining agreements under

49 U.S.C. § 11341(a). *Id.* at 119–124, 111 S.Ct. at 1159–61. The Unions contended that section 11341(a), which provides for an exemption "from the antitrust laws and from all other law, . . ., as necessary to let a carrier carry out [an approved] transaction," does not authorize the abrogation of existing collective bargaining agreements. The union in one of the cases also argued that any proposal which involved such a change was subject to mandatory bargaining under the RLA. *Id.* at 122, 111 S.Ct. at 1160. The District of Columbia Circuit Court of Appeals held that section 11341(a) does not relieve a party of collective-bargaining agreement obligations that may impede implementation of an approved transaction. *Id.* at 124, 111 S.Ct. at 1161. The Supreme Court, however, disagreed. Citing the broad and unambiguous language of the exemption, the Court held that section 11341(a) may exempt a party, "as necessary to carry out a[n approved] transaction," from the obligations imposed by both existing collective-bargaining agreements and the RLA, which ordinarily protects the rights created by those agreements. *Id.* at 131–33, 111 S.Ct. at 1165–66.

In the present case, the Unions concede as much but seek to adjudicate, in federal district court, whether such an exemption is appropriate in this particular case. The Unions contend that the Railroads' maintenance coordination plan is not incident to the approved Rio Grande merger, not necessary to carry it out, and that its implementation is therefore not exempt from the RLA's provisions by way of section 11341(a). The Railroads maintain that these claims must be raised before the ICC and we agree.

At the outset, we acknowledge that *Dispatchers* did not directly address this question. In reaching its conclusion regarding the breadth of the section 11341(a) exemption, the Court assumed without deciding that the abrogation of collective-bargaining agreements and RLA procedures proposed by the carriers in those cases were, in fact, necessary to implement an approved rail merger. *Id.* at 128, 133, 111 S.Ct. at 1163, 1166. The Court did not discuss the standards under which this determination is to be

made, let alone the precise question presented by the present case: *who is to decide?* Moreover, the *Dispatchers* cases came to the Court of Appeals under petitions for review from decisions of the ICC. They did not involve attempts to seek relief from the federal district court.

Nonetheless, we find the holding of *Dispatchers* and its overall conception of the statutory scheme determinative of this case. First of all, *Dispatchers* reiterates the proposition that under the ICA, "the Interstate Commerce Commission [has] *exclusive* authority to examine, condition, and approve proposed mergers and consolidations of transportation carriers within its jurisdiction." *Id.* at 119–120, 111 S.Ct. at 1159 (emphasis added) (citing 49 U.S.C. § 11343(a)(1)). Second, *Dispatchers* makes clear that under section 11341(a), the ICC has the effective power of exempting parties to a railroad merger from any provision of the RLA, by approving that merger. *See id.* at 131–33, 111 S.Ct. at 1165–66. It follows from these propositions that where a railroad which has been a party to an ICC-approved merger claims that certain proposed actions are incident to that merger and exempt from RLA procedures under section 11341(a), the ICC has exclusive authority to resolve a challenge to these claims.

In the present case, the Railroads have proposed an operational change, which they assert is incident to their recent merger, subject to the *New York Dock* procedures and exempt from the RLA under section 11341(a). The Unions claim that the Railroads' proposal was not within the scope of the ICC's merger approval, not "necessary to the implementation of an approved merger," and, therefore, not entitled to the section 11341(a) exemption. We are persuaded that because the ICC had exclusive authority to approve the Rio Grande merger and thereby exempt the Railroads from any procedural or substantive law which might otherwise impede that merger, it should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption. Such orders would, of course, be subject to appellate review in the circuit court of appeals, under 28

U.S.C. § 2321(a), with the appropriate standard of deference to the agency decision. A contrary result would interfere with the exclusive authority that the statutory scheme confers upon the ICC in this area.

We find that our conclusion is consistent with the objectives which inform section 11341(a). In *Dispatchers*, the Supreme Court explained that the purpose behind section 11341(a) is to "promote 'economy and efficiency in interstate transportation by [removing] the burdens of excessive expenditure.'" *Id.* at 132, 111 S.Ct. at 1165. The Court also intimated that the ability of the ICC to exempt parties from RLA procedures and impose an alternative set of procedures in connection with a merger is integral to meeting that objective:

> Section 11341(a) guarantees that once [the] interests [of the public and adversely affected employees] are accounted for and once the consolidation is approved, obligations imposed by laws such as the RLA will not prevent the efficiencies of consolidation from being achieved. If § 11341(a) did not apply to bargaining agreements enforceable under the RLA, rail carrier consolidations would be difficult, if not impossible, to achieve. The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated. The immunity provision of § 11341(a) is designed to avoid this result.

*Id.* at 133, 111 S.Ct. at 1165–66 (internal citations omitted). As long as the section 11341(a) exemption exists and the ICC imposes expedited dispute resolution procedures to facilitate railroad mergers, merged carriers will claim that proposed operational changes are within the contemplated scope of the approved merger and unions will deny it. If we held that parties could litigate in federal district court the scope of an approved merger and the corresponding breadth of the section 11341(a), we would surely interfere with the ICC's ability to efficiently facilitate mergers. We would invite a barrage of collateral challenges to the ICC's authority which would be likely to frustrate and delay

the administration of mergers in a way that section 11341(a) was clearly meant to avoid.

The Eleventh Circuit Court of Appeals came to a similar conclusion under remarkably similar circumstances. *Brotherhood Ry. Carmen Div. of Transp. Comm. Int'l Union (TCU) v. CSX Transp., Inc.,* 855 F.2d 745 (11th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989) *("Carmen v. CSX ").* In *Carmen v. CSX,* a recently merged rail carrier sought to close one of its maintenance facilities, transfer some its employees to other facilities, and eliminate a number of jobs. *Id.* at 746. After the carrier and the union representing the affected employees failed to reach an agreement implementing the proposal, the carrier sought to arbitrate the dispute under the *New York Dock* procedures, which the ICC had imposed in connection with the carrier's prior merger. The union filed an action in federal district court seeking to avoid arbitration by claiming that the proposed action had not been approved in the ICC's merger approval order, that its implementation was not governed by the *New York Dock* procedures, and that compulsory arbitration would violate its rights under the RLA. *Id.* at 746–47.

While the district court action was pending, an arbitration committee proceeded to adjudicate the underlying dispute. The committee's neutral member concluded that part of the carrier's proposal was necessary to carry out the ICC–approved merger, that it was exempt from the RLA, and that it could therefore be implemented by compulsory arbitration under the *New York Dock* conditions. *Id.* at 747–48. Both parties appealed the arbitrator's decision to the ICC. In the meantime, the parties moved for partial summary judgment in the district court action. After entering a 10–day temporary restraining order enjoining implementation of the carrier's proposal, the district court ultimate-

ly granted summary judgment to the carrier. *Id.* at 746, 748.

On appeal, the court of appeals vacated the district court's order on the ground that it had improperly assumed jurisdiction over the matter. *Id.* at 748. The court observed that the arbitrator's decision was only authoritative as an extension of the authority of the ICC, that it was appealable to the ICC, and ultimately, by exclusive grant of jurisdiction, to the court of appeals under 28 U.S.C. §§ 2321(a) and 2342(5). Proceeding upon these premises, the court concluded that by filing the district court action, the union had attempted "to bypass the appropriate procedures for review of the arbitration award ... rather than going through the normal channels of appeal to the ICC and then to the Court of Appeals." *Id.* at 748. The court emphasized that by assuming jurisdiction over the matter, the district court had interfered with the court of appeals' exclusive authority to review ICC decisions.

In the present case, we rest our conclusion not upon the court of appeals' exclusive jurisdiction to review ICC orders but, instead, upon the ICC's exclusive jurisdiction in the field of railroad mergers and the breadth of its authority.[2] Nevertheless, *Carmen v. CSX* provides persuasive authority for our position. First, it supports the proposition that a lawsuit like the one at issue here may serve to circumvent or frustrate the procedures which have been put in place to efficiently resolve labor disputes which arise in connection—or allegedly in connection—with a railroad merger. Second, it underscores the fact that by affirming the denial of subject matter jurisdiction in the district court, we neither deny the Unions redress nor violate their rights under Article III of the Constitution: all "rules, regulations and final orders" of the ICC are reviewable by this court. 28

---

**2.** We note that our slight divergence from the rationale adopted by the Eleventh Circuit Court of Appeals in *Carmen v. CSX* is intentional. In that case, the arbitration committee had not yet issued an award, let alone held hearings, at the time the union filed its complaint. *See id.* 855 F.2d at 746–47. The court appears to have overlooked this point when it concluded that the district court lacked jurisdiction because the lawsuit was a collateral attack on the *arbitration*

*award* itself. *See id.* at 748–49. The facts of the present case are identical in that the arbitration proceeding was not conducted until after the action was filed—indeed not until the action was dismissed. Our holding in this case emphasizes that the district court did not have jurisdiction over the subject matter of the lawsuit, ab initio, regardless of the fact that arbitration awards were later rendered.

U.S.C. § 2342(5). As the court concluded in *Carmen v. CSX,* we therefore find "no injustice or inefficiency" in reposing jurisdiction with the ICC. *See id.* at 749.

The Unions insist that because their lawsuit seeks the protection of certain rights under the RLA and because the federal district court has jurisdiction over the interpretation and application of that statute, the district court should have jurisdiction over this case. In support of their argument, the Unions principally rely on three authorities: the Supreme Court's decision in *Seaboard Air Line R.R. v. Daniel,* 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948) (*"Seaboard"*), the concurrence of Justice Stevens in *Interstate Commerce Comm'n v. Brotherhood of Locomotive Eng'rs,* 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) (*"Locomotive Engineers"*), and a decision of the Eighth Circuit Court of Appeals, *Brotherhood of Locomotive Eng'rs v. Chicago and North Western Ry.,* 314 F.2d 424 (8th Cir.1963), *cert. denied,* 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963) (*"Chicago and North Western"*). However, we find none of these persuasive authority for the proposition asserted.

In *Seaboard,* the ICC approved a railroad merger and ordered it implemented under certain conditions which violated South Carolina law. Fearing prosecution by the State of South Carolina, the merged railroad sought an injunction in the South Carolina courts preventing the enforcement of the subject statutes and the imposition of certain penalties. The Railroads argued that it had been exempted by the ICC under section 11341(a) from those statutes. In an appeal to the South Carolina Supreme Court, the court concluded that it had jurisdiction, denied the injunction, and held that the ICC had exceeded its authority by granting the exemption. The United States Supreme Court reversed on the merits, but held that the state court did have jurisdiction over the question because the railroad was faced with a peculiar dilemma: the railroad would be punished by the state for abiding by the ICC's order and punished by the ICC for failing to do so. *Id.* 333 U.S. at 122–23, 68 S.Ct. at 429. Given that the ICC could not have granted the injunctive relief that the railroad sought, a contrary conclusion would have left the railroad without a single jurisdiction to which it could have applied for relief. In the present case, by contrast, the Unions are not presented with this dilemma. They merely seek to establish that the ICC's merger approval order, by way of section 11341(a), does not exempt the Railroads from implementing their maintenance consolidation proposal in accordance with the RLA. This is relief which the ICC is clearly capable of granting.

Likewise, Justice Stevens' concurrence in *Locomotive Engineers,* does little to advance the Unions' position. The Unions quote a footnote in the concurrence for the proposition that "[a]ny tribunal that is faced with a claim that a party is violating some 'other law' has the responsibility of determining whether an exemption is 'necessary to let that person carry out the transaction, hold, maintain or operate property, and exercise control or franchises acquired through the transaction.'" *Locomotive Eng'rs,* 482 U.S. at 300 n. 13, 107 S.Ct. at 2377 n. 13 (Stevens, J., concurring). The Unions seem to suggest that this statement somehow confers jurisdiction on the district court in the present case. We disagree. The footnote, when considered in its context, elucidates the circumstances under which a section 11341(a) exemption is appropriate, but says nothing of who is to make this determination.

Finally, we observe that the Eighth Circuit Court of Appeals in its 1963 opinion in *Chicago and North Western* did not have the benefit of the Supreme Court's reasoning in its 1991 *Dispatchers* decision. In *Chicago and North Western,* not unlike the present case, a rail labor union filed an action in federal district court seeking a declaration that under the RLA it could not be forced to arbitrate a labor dispute arising out of a rail merger, even though both the carrier and the union had·stipulated to such a procedure. The rail carrier argued not only that the stipulation was binding but that the ICA, 49 U.S.C. § 5(11) (repealed 1978), exempted it from the procedures of the RLA. Section 5(11) contained language analogous to that of section 11341(a). *See* 49 U.S.C. § 5(11) (1976). The district court found, over the

objection of the railroad, that it possessed jurisdiction to resolve the case and proceeded to do so. The Court of Appeals affirmed. The Court of Appeals concluded that jurisdiction existed under 28 U.S.C. § 1337, the statute which generally provides for district court jurisdiction over actions arising under acts of Congress which regulate commerce. *Chicago and North Western,* 314 F.2d at 428. Relying on *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), the court concluded that because the action before it required determinations regarding the interpretation and interplay of the ICA and RLA, it presented federal questions which were properly adjudicated by the district court. *Chicago and North Western,* 314 F.2d at 428.

For a number of reasons, however, this analysis is not persuasive. First, the *Gully* case dealt with the question of whether a contract action brought in state court against a federally regulated bank should be removed to federal court because it sufficiently implicated matters governed by federal law. *See Gully,* 299 U.S. at 111–12, 57 S.Ct. at 97. In this case, the issue is not whether federal law is implicated. That point cannot be disputed. Instead, the issue relates to which of several federal tribunals should adjudicate the matter. Second, the analysis applied to the jurisdictional question in *Chicago and North Western* does not consider the exclusivity of the ICC's authority in the area of railroad mergers and the scope of that authority, which, as we have discussed, is reinforced by the Court's decision in *Dispatchers.* Thus, we do not believe this is persuasive authority for a contrary conclusion.

## IV.

### CONCLUSION

For the foregoing reasons, we conclude that the district court properly dismissed this case for lack of subject matter jurisdiction.

**AFFIRMED.**