

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-2-2001

# Union RR Co v. United Steelworkers

Precedential or Non-Precedential:

Docket 97-3680

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Union RR Co v. United Steelworkers" (2001). *2001 Decisions*. Paper 38.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/38

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3680

UNION RAILROAD COMPANY

v.

UNITED STEELWORKERS OF AMERICA; UNITED
STEELWORKERS OF AMERICA - DISTRICT 10; UNITED
STEELWORKERS OF AMERICA - LOCAL 3263,
        Appellants

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action Nos. 96-cv-02095)
District Judge: Honorable Donetta W. Ambr ose

No. 98-6511

UNITED STEELWORKERS OF AMERICA,
AFL-CIO-CLC,

        Petitioner

v.

UNITED STATES OF AMERICA;
and
SURFACE TRANSPORTATION BOARD,

        Respondents

Union Railroad Company ("URR") and
Bessemer and Lake Erie Railroad
Company ("B&LE"),

        Intervenors*
        *(See Clerk Order of
        2/16/99)

On Petition for Review of an Order of the
Surface Transportation Board enter ed in
STB Finance Docket No. 31363 (Sub-No. 3)

Argued January 25, 2000

Before: GREENBERG,** NYGAARD and
ROTH, Circuit Judges

(Opinion filed: March 1, 2001)

Jeffrey S. Berlin, Esquire (Ar gued)
Mark E. Martin, Esquire
Sidley & Austin
1722 Eye Street, N.W.
Suite 300
Washington, DC 20006

 Attorneys for Appellee/Intervenors

David R. Jury (Argued)
Assistant General Counsel
United Steelworkers of America
5 Gateway Center
Pittsburgh, PA 15222

 Attorney for Appellants/Petitioner
_____

** After this case was argued, but prior to the issuance of this opinion,
Judge Greenberg took senior status on June 30, 2000.

Robert J. Wiggers, Esquire
John J. Powers, III, Esquire
United States Department of Justice
Antitrust Division, Room 10535
601 D Street, N.W.
Patrick Henry Building
Washington, DC 20530

 Attorneys for Respondent

Henri F. Rush
General Counsel
Theodore K. Kalick, Esquire (Argued)
Surface Transportation Board
Office of General Counsel
1925 K Street, N.W.
Suite 600
Washington, DC 20423

 Attorneys for Surface
Transportation Board Respondent

OPINION OF THE COURT

ROTH, Circuit Judge:

These consolidated cases present the question whether a federal district court has subject matter jurisdiction to adjudicate challenges to changes to a collective bar gaining agreement, made in connection with a rail mer ger authorized by the Surface Transportation Board (STB). The District Court and the STB concluded that the latter has exclusive authority to resolve labor disputes arising out of STB-approved rail consolidations. For the r easons set out below, we will affirm the decision of the District Court and deny the petition for review of the decision of the STB.

I. Factual and Procedural History

In 1988, Transtar, Inc., a transportation holding company located in Monroeville, Pennsylvania, acquired control of the Union Railroad Company and the Bessemer and Lake Erie Railroad Company, along withfive other rail

3

carriers and one water carrier. This consolidation was achieved pursuant to an Interstate Commerce Commission (ICC) authorization (Control Order), which, under 49 U.S.C. S 10505, exempted the transaction from the prior approval requirements of 49 U.S.C. SS 10746, 11321, and 11343.1 Blackstone Capital Partners, L.P., and USX Corporation –– Exemption from 49 U.S.C. 10746, 11321 and 11343, Finance Docket No. 31363, served Dec. 23, 1988. The ICC found that exempting the transaction would "minimiz[e] administrative expense" and "foster sound economic conditions and encourage efficient management." Id. slip op. at 2. When the ICC authorized a merger , it was required by 49 U.S.C. S 11326 to impose labor pr otections for affected employees. Here, the ICC complied with S 11326 by applying the New York Dock employee protective conditions.

The New York Dock conditions ar e those adopted in New York Dock Ry. – Control – Br ooklyn Eastern District Terminal, 360 I.C.C. 60, 84 (1979), aff 'd. sub. nom. New York Dock Ry. v. United States, 609 F .2d 83 (2d Cir. 1979). Under New York Dock, changes r elated to authorized transactions are accomplished through implementing agreements negotiated between the rail carrier and representatives of the employees. If the parties cannot agree to the terms and conditions of the implementing agreement, either party may unilaterally invoke an arbitration proceeding to resolve the dispute.2

_____

1. The ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803, abolished the ICC (S 101, 109 Stat. at 804) and transferred its remaining functions to the Surface Transportation Board (STB) effective January 1, 1996. The Act also resulted in the renumbering of various provisions of the ICA. Following are the former section numbers that are relevant here with the new numbers in brackets: S 10505[S 10502]; S 11341 [S 11321]; S 11347 [S 11326]. The new pr ovisions were re-enacted without substantive change. In referring to the statute in this opinion, we will employ the current section numbering.

2. More specifically, the New York Dock conditions provide compensatory benefits to employees who are adversely af fected by a railroad merger or control transaction, including protecting affected employees' wages for up to six years. The New York Dock conditions also fix procedures for making adjustments in workforces and labor agr eements that will permit carriers to implement an authorized transaction. Article I, S 4 requires a

4

Prior to the 1988 consolidation, the Union Railr oad Company and the Bessemer and Lake Erie Railr oad Company (collectively, the Railroad) had maintained separate accounting departments. The workers in each of these departments worked solely for their respective carriers and under separate collective bargaining agreements. The clerical workers employed by Union Railroad were members of the United Steelworkers of America (USWA); the clerical workers of Bessemer and Lake Erie were members of the Transportation Communications International Union.

As part of the implementation of the 1988 Contr ol Order, the Railroad sought to coordinate certain clerical work by moving Union Railroad's accounting department to Bessemer and Lake Erie Railroad. As requir ed by Article 1, S 4, of the New York Dock conditions, the Railroad notified the unions of its proposed coordination in a letter dated September 3, 1996. The notice stated that nine new positions would be established at Bessemer and Lake Erie Railroad to perform the consolidated work; nine positions at Union Railroad would thereby be eliminated. The notice also explained that the nine former Union Railroad employees would be incorporated into the existing Bessemer and Lake Erie Railroad clerical seniority roster according to their Union Railroad seniority rank.

The USWA, the Union Railroad clerical union, claimed that the proposed coordination of work would violate a scope rule contained in the United Railroad/USW A's collective bargaining agreement, which forbade non-Union Railroad employees from perfor ming its accounting work.3

_____

carrier to give affected employees ninety days' advance notice of a proposed transaction. The parties must begin negotiation of an implementing agreement within ten days of the notice; after thirty days, either party may submit the dispute to arbitration before an arbitrator acting pursuant to STB authority. If the parties ar e unable to select an arbitrator within five days, they may ask the National Mediation Board to appoint one. The arbitration hearing must begin within twenty days of the arbitrator's designation and the decision is to be rendered within thirty days of the hearing. 360 I.C.C. at 84, 85.

3. The scope rule provided: "[If][a]ny person outside the bargaining unit or any person not covered by the bargaining unit performs work in

5

The USWA maintained that changes to the scope rule must be made pursuant to the Railway Labor Act (RLA), 45 U.S.C. SS 151 et seq. The USW A also argued that it was not a party to any other agreement, such as the W ashington Job Protection Agreement of 1936,4 that would authorize the contemplated changes. Accordingly, the USW A asserted that it considered the Railroad's letter of September 3, 1996, detailing the planned coordination, as a notice of proposed changes in the collective bargaining agreement under S 6 of the RLA.

On October 26, 1996, the Railroad responded by providing formal notice that it was invoking arbitration under Article I, S 4, of New York Dock. The USWA countered in a letter dated November 1, 1996, that it could not be compelled to arbitrate because the RLA allows changes to existing collective bargaining agreements only if the changes are arbitrated with the mutual consent of both parties. 45 U.S.C. S 157. It would ther efore consider the Railroad's invocation of arbitration under New York Dock as a termination of voluntary negotiations underS 6 of the RLA. The USWA further asserted that it would not aid in the selection of a New York Dock arbitrator. The Railroad subsequently requested the National Mediation Board (NMB) to appoint a neutral referee to arbitrate the dispute. The NMB appointed Arbitrator Witt.

On October 29, 1996, the USWA served the Railroad with an RLA S 6 bargaining proposal, asking for numerous

_____

violation of this section and the employee who otherwise would have performed this work can reasonably be identified, the Company shall pay such employee the applicable standard hourly rate for the time involved or for four (4) hours, whichever is gr eater." This rule was first adopted in 1978 and subsequently revised in 1981.

4. The Washington Job Protection Agr eement was signed by many of the nation's rail carriers and unions in 1936. It r equired carriers to compensate employees dismissed or displaced as a r esult of railroad mergers and to pay relocating costs. It also provided that carriers give notice of consolidation to employees and to negotiate implementing agreements for coordinating workfor ces. Disputes concerning the interpretation of agreements were submitted to binding arbitration. See New York Dock, 609 F. at 87.

changes to the collective bargaining agr eement. The Railroad responded by filing this action, seeking declaratory and injunctive relief under the Declaratory Judgement Act, 28 U.S.C. S 2001, and the RLA, 45 U.S.C. S 151. The Railroad sought a declaration that the USW A's October 29, 1996, S 6 notice was premature because of a moratorium clause in the existing collective bargaining agreement and that self-help was not available.

The USWA filed its counterclaim on December 9, 1996, seeking declaratory and injunctive relief pr eventing the Railroad from carrying out its proposed coordination of clerical workers through the New York Dock arbitration procedure. Compelled arbitration of the dispute under this procedure, the USWA claimed, would violate its rights under the RLA. The USWA next filed a motion for summary judgment, with respect to both the Railr oad's claim and its counterclaim. The Railroad, in tur n, filed a motion to dismiss the counterclaim for lack of subject matter jurisdiction.

On November 24, 1997, the District Court found, inter alia, that it lacked subject matter jurisdiction over the USWA's counterclaim: "A review of the relevant case law persuades me that the propriety of the Railr oad's invocation of the New York Dock process must be resolved by the STB, and by the Court of Appeals. I do not have jurisdiction over these matters." Union Railroad Company v. United Steelworkers of America, No. 96-2095, slip op. at 8 (WDPA, Nov. 1997). The USWA timely appealed the District Court's November 23, 1997, dismissal.5

While the action was pending in the District Court, the New York Dock arbitration proceeded, with the USWA preserving its objections to the arbitrator's jurisdiction. On October 21, 1997, Arbitrator Witt issued her award (Witt Award), which imposed, with a few modifications, the implementing agreement that the Railroad had proposed. On November 10, 1997, the USWA petitioned the STB for an administrative review of the Witt A ward, pursuant to 49

---

5. The District Court has also granted USW A's motion for summary judgment on the complaint, making the order appealed from a final order.

7

C.F.R. S 1115.8. By a decision dated December 16, 1998, the STB declined review of the Witt A ward. Union Railroad Company and Bessemer and Lake Erie Railroad– Arbitration Review – United Steel Workers of America, STB Finance Docket No. 31363 (Sub–No. 3), served Dec, 16, 1998. The USWA filed a timely petition for review of the STB decision.

## II. Jurisdiction

The District Court dismissed the USWA's counterclaim for lack of subject matter jurisdiction. We have jurisdiction under 28 U.S.C. S 1291 to review thefinal judgment of the District Court.

The STB had jurisdiction over the USWA's petition to review the arbitral decision under 49 U.S.C.SS 10502, 11323, and 11326. Our jurisdiction over the USW A's petition to review the STB's decision is based on 28 U.S.C. SS 2321(a), 2342(5), and 2344.

## III. Standard of Review

We exercise plenary review over the District Court's dismissal of the USWA's counterclaim for lack of subject matter jurisdiction. See Erienet, Inc. v. V elocity Net, Inc., 156 F.3d 513, 514 (3d Cir. 1998).

We may not upset the decision of the STB unless we find that it is arbitrary, capricious, or in excess of its statutory authority. See National Small Shipments T raffic Conference, Inc., v. United States, 887 F.2d 443, 445 (3d Cir. 1989).

## IV. Discussion

## A. The District Court Decision

The jurisdictional question at issue here--whether the District Court had subject matter jurisdiction to adjudicate the USWA's challenge to the Railroad's implementation of its 1988 ICC-authorized consolidation--requir es us to examine the relationship between the Railr oad Labor Act and the Interstate Commerce Act. The USW A argues that the RLA and the ICA are "co-equal" and complementary

8

statutory schemes and that, therefore, the District Court had general federal subject matter jurisdiction pursuant to 28 U.S.C. S 1331 to hear its counterclaim seeking enforcement of its rights under the RLA. The Railroad contends that the ICA is the exclusive statutory scheme for dealing with railroad consolidations and that accordingly the STB has exclusive jurisdiction to consider disputes concerning changes to labor agreements which are necessary to implement an STB-authorized consolidation. We agree with the Railroad.

The RLA was passed in 1926 to encourage collective bargaining between railroads and their employees, thereby preventing strikes and interruptions to interstate commerce. See Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 148 (1969). To this end, the RLA establishes elaborate procedures for the negotiation, enforcement, and modification of collective bargaining agreements between railr oad carriers and railroad labor unions. The RLA also imposes upon parties the obligation to engage in good-faith negotiations and to maintain status quo without resorting to self-help while the RLA's remedies are being exhausted. The exhaustion of the RLA's remedies is, however, "an almost interminable process." Id. at 149. "[T]he procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will pr ovide in time an agreement that resolves the dispute." Brotherhood of Ry. & Steamship Clerks, etc. v. Florida East Coast Ry. Co. , 384 U.S. 238, 246 (1966).

The ICA, on the other hand, gives substance to what has been, since the adoption of the Transportation Act of 1920, the nation's policy of pursuing railroad carrier consolidation as a means of promoting the health and efficiency of the railroad industry: "[C]onsolidation of the railroads of the country, in the interest of economy and efficiency, became an established national policy . . . so intimately r elated to the maintenance of an adequate and efficient rail transportation system that the `public inter est' in the one cannot be disassociated from that in the other ." United States v. Lowden, 308 U.S. 225, 232 (1939); see also, St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298,

9

315-321 (1954). The ICA grants the STB exclusive authority to approve mergers and acquisitions of transportation carriers within its jurisdiction. 49 U.S.C. S 11323(a). It also provides that STB-authorized consolidations ar e exempted from "the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier . . . carry out the transaction." 49 U.S.C. S 11341(a).6 The authorization may take one of two forms. The STB may, under 49 U.S.C. SS 11323-11324, affir matively approve a merger, acquisition of control, or other rail consolidation by determining that it is "consistent with the public interest." U.S.C. S 11324(c). Alternatively, 49 U.S.C. S 10505 allows the STB to authorize a consolidation by granting an exemption for the prior approval r equirements of SS 11323-11324.7 In either case, the STB is required to impose labor protective measures for af fected employees as a condition of consolidation authorizations. 49 U.S.C. S 11326.

Our analysis of the relationship between the RLA and the ICA begins with the most recent Supreme Court decision on the subject, Norfolk and Wester n Ry. Co. v. American Train Dispatchers' Ass'n., 499 U.S. 117, 132 (1991). There, labor unions in two separate cases challenged ICC or ders that relieved the railroad carriers from collective bargaining

_____

6. 49 U.S.C. S 11321(a) provides:

> The authority of the Board under this subchapter is exclusive. A rail carrier or corporation participating in or r esulting from a transaction approved by or exempted by the Boar d under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A rail carrier, corporation, or person participating in that appr oved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exer cise control or franchises acquired through the transaction.

7. Exemption from the full approval pr ocess is appropriate when "the transaction or service is of limited scope" or when "the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power." 49 U.S.C.S 10505.

10

agreement obligations. The unions argued that S 11321(a), which confers to transactions necessary for the implementation of ICC-authorized consolidations immunity from "all other law," does not abr ogate existing collective bargaining agreements. Modification of such agreements, the unions insisted, must be made pursuant to the RLA.

The Supreme Court disagreed: "RLA is a law that, under [S 11321(a)], is superseded when an ICC-approved transaction requires abrogation of collective-bargaining obligations." Id. at 132 (citations omitted). This conclusion, the Supreme Court explained, is consistent with the ICA's overall statutory scheme. The ICA was designed to pr omote "economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure." Texas v. United States, 292 U.S. 522, 534-35 (1934). Recognizing that consolidations of carriers would result in employee dismissals, transfers and other changes detrimental to employees, the ICA mandated that the ICC impose safeguards, like the New York Dock  employee protective conditions, to ensure that employee inter ests of the affected parties are protected. Section 11321(a), in turn, guaranteed that, once these interests are accounted for, the ICC would be free from requirements, such as provisions of the RLA, that might impede the consolidation. If the RLA wer e not superseded by the ICA, the Court observed, "rail carrier consolidations would be difficult, if not impossible, to achieve," because "[t]he resolution process for major disputes under the RLA would so delay the pr oposed transfer of operations that any efficiencies the carriers sought would be defeated." Dispatchers, 499 U.S. at 133 (citations omitted).8

_____

8. The Union argues, based in part on our decision in Railway Labor Executives' Ass'n. v. Pennsylvania & Lake Erie Railr oad Co., 845 F.2d 420 (3d. Cir. 1988), that the RLA and the ICA are co-equal and complementary sources of legal rights. In that case, we focused on the differing policy goals animating the RLA and the ICA. The former, we stated, advances the policy of avoiding "disruptions in the railroad industry by promoting collective bargaining and preventing strikes." Id. at 436. The latter promoted the policy goal of"encourag[ing] the flow of capital into the [rail] industry" and "expedit[ing] the approval process so
that efficient transactions are not derailed by red tape." Id. In light of

11

Although Dispatchers did not directly address the jurisdictional question at issue here, the Ninth and Fourth Circuit Courts of Appeals have interpreted Dispatchers, and the relationship between the RLA and the ICA that it envisions, as compelling the conclusion that the ICC (now the STB), not the district court, has the exclusive authority to resolve labor disputes that arise fr om implementing an ICC (or STB)-authorized transaction. Railway Labor Executives' Ass'n. v. Southern Pacific T ransportation Co., 7 F.3d 902 (9th Cir. 1993); Nor folk & Western Ry. v. Brotherhood of Railroad Signalmen, 164 F.3d 847 (4th Cir. 1998).

In Southern Pacific, the ICC appr oved a merger of certain railroads pursuant to 49 U.S.C. S 11321(a) and, in compliance with 49 U.S.C. S 11326, imposed the New York Dock conditions to protect existing and future employees from the adverse effects of the mer ger. When time came for the merged railroad to coordinate work, it claimed, believing that the coordination was incident to the mer ger, that the changes should be implemented through the New York Dock procedures. The union ther e, like the USWA in the present case, countered that changes to the existing collective bargaining agreement could be made only through RLA procedures. The union br ought suit, claiming that a New York Dock arbitration of its dispute without its consent would violate its RLA rights.

The Ninth Circuit affirmed the district court's ruling that it lacked subject matter jurisdiction over the suit. The court stated that the Supreme Court's Dispatchers decision, while not directly on point, was determinative:

> First of all, Dispatchers reiterates the proposition that under the ICA, "the Interstate Commerce Commission

_____

these differences, we explained, the judiciary "must reconcile the two statutes as much as possible and attempt to r each a result that will produce the minimum possible conflict with Congressional intent." Id. at 423. But in invoking our decision in P&LE, the Union neglects to acknowledge that we were without the benefit of the Supreme Court's decision in Dispatchers. To the extent our observations on the relationship between the RLA and the ICA conflict with those of the Supreme Court in Dispatchers, ours must give way.

12

> [has] exclusive authority to examine, condition, and
> approve proposed mergers and consolidations of
> transportation carriers within its jurisdiction." Second,
> Dispatchers makes clear that under Section [11321(a)],
> the ICC has the effective power of exempting parties to
> a railroad merger from any pr ovision of the RLA, by
> approving the merger. It follows from these
> propositions that where a railroad which has been a
> party to an ICC approved merger claims that certain
> proposed actions are incident to that mer ger and
> exempt from RLA procedures under section [11321(a)],
> the ICC has exclusive authority to resolve a challenge
> to these claims.

Southern Pacific, 7 F.3d at 906 (internal citations omitted).
The court went on to state that the conclusion that
jurisdiction belongs to the ICC and not the district court
also comports with the policy objective underlying the ICA--
the promotion of economy and efficiency of interstate
transportation. See Dispatchers, 499 U.S. at 132; Texas v.
United States, 292 U.S. at 134. Integral to meeting this
objective is the authority vested in the ICC to substitute
RLA procedures with the expedited dispute resolution
prescribed by the New York Dock conditions. But, if parties
were allowed to litigate in federal district court the propriety
of invoking the New York Dock pr ocess, the ICC's ability to
meet this stated objective of facilitating rail consolidations
would be hindered: "We would invite a barrage of collateral
challenges to the ICC's authority which would be likely to
frustrate and delay the administration of mer gers in a way
that section [11321(a)] was clearly meant to avoid." Id. at
907.

The Fourth Circuit in Norfolk & W estern Ry. v.
Brotherhood of Railroad Signalmen, 164 F.3d 847 (4th Cir.
1998) reached the same conclusion. As in Southern Pacific
and the present case, the unions in Signalmen sought a
declaratory judgement in district court that changes to
collective bargaining agreements in connection with the
implementation of a STB-authorized rail consolidation must
be made pursuant to RLA procedures. The district court
dismissed the case for lack of subject matter jurisdiction.
The court of appeals found that the dismissal was pr oper.

13

Drawing on Dispatchers, the court held that within the context of an STB-authorized merger,"any effort to challenge changes in the collective bargaining agreements proposed . . . must be presented in thefirst instance to the STB under its exclusive jurisdiction and may not be negotiated under the RLA."9Id. at 855.

The USWA argues that Dispatchers , Southern Pacific, and Signalmen are inapposite because the consolidations in those cases were authorized through the full approval process of S 11323 while the merger here was achieved through the abbreviated process ofS 10502. This distinction is critical, according to the USW A, because the

_____

9. The Eleventh Circuit came to the same conclusion--although by way of a different rationale--in Brotherhood Ry. Carmen, Div. Of Transp. Comm. Int'l Union (TCU) v. CSX Transp., Inc. , 855 F.2d 745 (11th Cir. 1988), a pre-Dispatchers case. Ther e, the ICC approved a merger of certain rail carriers and incident to that appr oval imposed the New York Dock conditions. The consolidated carrier then proposed to close down a repair shop and transfer the work and employees to another facility. Attempts between the carrier and the union r epresenting the affected employees to negotiate an implementing agreement on the transfer failed and the carrier sought arbitration of the dispute under New York Dock. The union in turn filed an action in district court arguing, inter alia, that
the implementing agreement was not gover ned by the New York Dock procedures and that compulsory arbitration would violate the RLA. While the action in district court was pending, a New York Dock arbitrator considered the dispute and rendered a decision. Both parties appealed the arbitrator's decision to the ICC. Before the appeal was heard by the ICC, the district court granted summary judgment to the carrier.

A panel of the Eleventh Circuit vacated the district court's order, finding that the district court lacked subject matter jurisdiction to adjudicate the dispute. The court based its decision on Congress's grant of exclusive jurisdiction to the courts of appeals to review ICC orders. 28
U.S.C. SS 2231(a), 2342(5). The court explained: "The arbitration opinion and award . . . is authoritative only as an extension of the authority of the ICC. . . . [T]he present lawsuit is, in effect, a collateral attack on the
arbitration award; it is an attempt by [the union] to have the district court set aside the arbitration award, rather than going through the normal channels of appeal to the ICC and then to the Court of Appeals." Id. at 745. By assuming jurisdiction over the dispute, the court ruled, the district court improperly interfer ed with the normal appeals procedure and encroached on the court of appeals' exclusive authority to review ICC decisions. Id.

S 11321(a) exemption "from all other laws" applies only to S 11323 transactions. This argument is based on the language of S 11321(a), which provides that "[t]he authority of the Board under this subchapter is exclusive." (emphasis added). Section 10502 is not in the same subchapter as S 11321. See Railway Labor Executive Ass'n v. United States, 987 F.2d 806, 813 (D.C. Cir . 1993) ("That decision [Dispatchers] is not applicable her e, however, because S [11321(a)] applies to transactions exempted under subchapter III, of which it is a part. The Commission exempted the transaction at issue here underS [10502], which is in subchapter I"). The USWA ar gues, therefore, that when the STB is not given the power of making exemptions--that is, when its actions are not taken pursuant to S 11321(a)--there is no basis for granting exclusive jurisdiction to the STB.

The USWA's argument misses the mark, confusing the STB's scope of exemption under S 11321(a) with its jurisdictional authority over disputes arising out of the implementation of railroad consolidations. Although S 11321(a) expressly can preempt the RLA, the STB's jurisdictional exclusivity does not depend alone on S 11321(a). Rather, the STB also finds jurisdictional authority in the overall statutory design of the ICA. Congress, in seeking to promote the economy and efficiency of the rail industry, has given the STB considerable authority over railroads, granting to it exclusive jurisdiction to authorize railroad mergers and consolidations. 49 U.S.C. S 11321(a). See Dispatchers, 499 U.S. at 119-20.

Among the matters which the ICA puts within the exclusive jurisdiction of the STB is the relationship between the railroad and its employees. Section 11324 mandates that the STB consider when approving a mer ger "the interest of the rail carrier employees af fected by the transaction." 49 U.S.C. S 11324(b)(4). Mor e importantly, S 11326 grants to the STB both the statutory authority and the mandate to impose on the rail carrier, as a condition of consolidation authorization, a "fair arrangement" that will protect the employees affected by the consolidation. All this demonstrates, as the Fourth Circuit noted in Signalmen, that "to the extent that a transaction subject to the STB's

15

approval impacts collective bargaining agreements or the relationship between railroads and their employees, the STB has exclusive jurisdiction in the first instance to consider the issues." 164 F.3d at 855. Thus, the exclusive jurisdiction to resolve labor problems in a merger exists independently of the S 11321(a) exemption of such a merger from other laws.10

The USWA contends, however, that interpreting the ICA as vesting the STB with exclusive jurisdiction to adjudicate all issues concerning railroad-employee r elationships which arise as a result of approved mergers is too sweeping. For this argument, it relies on the Seventh Circuit's decision in Harris v. Union Pacific Railroad, 141 F.3d 740 (7th Cir. 1998). There the court considered whether the ICA takes away from the district court jurisdiction to consider civil rights claims brought by two union members against a railroad carrier. The ICC had appr oved Union Pacific's

_____

10. To the extent that S 10502 mer gers may receive exclusive STB resolution of employee relations issues but not S 11321(a) exemption from "other laws," the justification for this result may be found in the fact that S 10502 mergers by definition are of "limited scope."

That said, we note that the USWA's ef fort to draw a distinction between an approved transaction under S 11321(a) and an exempted transaction under S 10502 has been rejected by the ICC, which found that S 11321(a) does apply to S 10502 transactions. In Rio Grande Industries, Inc., et al. -- Trackage Rights-- Burlington Northern R.R. Lines Between Kansas City, MO and Chicago, IL, ICC Finance Docket No. 31730, 1991 ICC LEXIS 57, served March 12, 1991, at *9-11, the ICC held that immunity under S 11321(a) extends to transactions exempted under S 10502. Accord Brother hood of Locomotive Engineers v. Boston & Maine Corp., 788 F.2d 794, 799-801 (1st Cir. 1986).

The conclusion that S 11321(a) applies to both"approved" and "exempted" transactions is consistent with polices behind the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980), which broadened and liberalized S 10502 in furtherance of the ICA's goal of revitalizing the railroad industry. See Coal Exporters Ass'n v. United States, 745 F.2d 76, 80-82 (D.C. Cir . 1984). By increasing the ICC's ability to exercise its power under S 10502, Congress indicated that the S 10502 procedure was an equal and even preferred way of regulating the railroad industry. See H.R. Rep. No. 96-1430, 96th Cong., 2d Sess. 105 (1980), reprinted in 1980 U.S.C.C.A.N. 4110, 4137.

16

acquisition of another carrier pursuant to S 11321(a). Although the ICC imposed the New York Dock conditions, it also permitted labor and management to negotiate different conditions "in a labor agreement enter ed into prior to consolidation, in which case protection shall be at the negotiated level, subject to our review to assure fair and equitable treatment of affected employees." Id. at 741 (quoting ICC order). The parties then r eached an alternative agreement for separation benefits. To qualify for the separation allowance, however, an employee on leave had to return to work within twenty days. Neither the union nor the management sought the ICC's review of the alternative agreement.

The two plaintiffs in Harris wer e on maternity leave at the time the labor agreement was posted; neither r eturned within twenty days. Their applications for separation benefits were denied. They then filed suit for sex discrimination in district court. The court dismissed the action for lack of subject matter jurisdiction. The Seventh Circuit reversed, holding that the civil rights laws did not put any obstacle in the way of the railroad mer ger at issue. None of the relief sought by the plaintif fs would be incompatible with the ICC's approval of the mer ger. It would be pointless, therefore, to deny jurisdiction to the district court in order to refer the civil rights issue to the STB.

The USWA urges us to follow Harris  by requiring that the STB articulate in its approval of a mer ger the laws that are necessary to displace. We do not read this result into Harris. We conclude that a case involving civil rights issues, arising from the application of a non-STB appr oved agreement to two members of a class, is distinguishable from the situation here where New York Dock arbitration has authorized changes in the labor agreement, which changes are necessary to implement the transaction. For that reason, even if we were bound to follow the Seventh Circuit, we would find Harris to be distinguishable.11

_____

11. In a related argument, the USW A contends that it cannot be made subject to the New York Dock pr ocedures because it was not a signatory to the Washington Job Protection Agr eement of 1936. On the USWA's

17

We conclude that the ICA--in its language and overall statutory design--reflects Congress's commitment to a national transportation policy that favors the consolidation of railroads. And Congress has decided that such a policy is best pursued by freeing rail consolidations from the burdensome delays and expenditures associated with RLA procedures. Thus, the ICA and the RLA ar e not complementary and co-equal statutory schemes, as the USWA proposes. The RLA must yield to the ICA when it impedes the implementation of a STB-approved consolidation. Moreover, the STB has the exclusive jurisdiction to adjudicate challenges to such an implementation. Accordingly, we will affir m the District Court's dismissal of the USWA's counter claim for lack of subject matter jurisdiction.

B. The STB Decision

We now turn to the USWA's petition for review of the STB decision of December 17, 1998. The standard the STB must apply in reviewing arbitration decisions is pr ovided in

_____

theory, only signatories to the Agreement have bargained away their RLA right to refuse to arbitration under New York Dock procedures. Wefind that this argument is without merit and agr ee with the District Court's conclusion that the ICC's authority S under 11326(a) to impose labor protections is "statutory in nature, and owe nothing to the WJPA."

Although the WJPA provisions are, in many respects, duplicated in the New York Dock conditions, the two sets of labor protections derive their authority from different sour ces and are not equivalent in scope. The WJPA is a contract, the provisions of which bind only those carriers and unions that consented to the Agreement. The New York Dock conditions, on the other hand, arose as a result of Congressional mandate. As part of the Transportation Act of 1940, Congr ess granted to the ICC express statutory authority to impose employee protection upon approval of railroad mergers. Pub. L. No. 76-785, 54 Stat. 898 (1941) (codified as amended at 49 U.S.C. SS 10101-11901 (1998)). It is pursuant to this statutory authority that the ICC developed the standard set of labor protections contained in New York Dock. The ICC's authority to impose the New York Dock conditions--and to make changes to labor agreements pursuant to those conditions--derives, therefore, from the ICA and reaches those carriers and unions who were not signatories to the WJPA.

18

Chicago & North Western Transportation Company, 3 I.C.C. 2d 729 (1987) ("Lace Curtain"), af f 'd. sub. nom. International Brotherhood of Electrical Workers v. ICC, 862 F.2d 330 (D.C. Cir. 1988). 49 CFR 1115.8. Under Lace Curtain, the arbitrator's decision is given deference and the STB will review "issues of causation, calculation of benefits, or the resolution of factual questions" only if there is egregious error. Review is thus limited to "recurring or otherwise significant issues of general importance regarding the interpretation of our labor conditions." 3 I.C.C. at 735–36. Based on this, the STB declined to review and vacate the Witt Award: "We find no reason to disturb the arbitrator's award under the Lace Curtain  standards. There is no issue of first impression; and any issues that are likely to recur have already been thor oughly resolved by us and the courts. [The USWA] has not shown egregious error or any other grounds requiring review of the arbitration award here." Union Railroad Company and Bessemer and Lake Erie Railroad –– Arbitration Review–– United Steel Workers of America, STB Finance Docket No. 31363 (Sub–No. 3), served Dec, 16, 1998, slip op. at 7–8.

The USWA presents in this appeal no challenges to the factual determinations made by the arbitrator , relying solely on the argument it made before the District Court that the STB does not have exclusive jurisdiction to adjudicate the USWA's RLA–based challenges to the implementation of the 1988 ICC–authorized consolidation. In light of our analysis in the previous section, we cannot say that the Board's conclusion that it has exclusive jurisdiction to consider whether the ICA preempts the RLA was arbitrary, capricious, or otherwise not in accordance with law. See National Small Shipments Traffic Confer ence, Inc. v. United States, 887 F.2d 443, 445 (1989). W e will, therefore, deny the petition for review of the STB's decision not to review the Witt Award.

V. Conclusion

For the foregoing reasons, we will affir m the judgment of the District Court and we will deny the petition for review of the decision of the Surface Transportation Board.

19

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

20