**AT & T COMMUNICATIONS, INC., Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**Civil Action No. 03–147.**

United States District Court, E.D. Pennsylvania.

Sept. 29, 2003.

---

B.H. Walling, Howard N. Feldman, Jorge Kotelanski, Laura H. Hamilton, Lois J. Lipton, Paul W. Kisslinger, Robert J. Higgins, Dickstein, Shapiro, Morin and Oshinsky L.L.P., Washington, DC, Matthew J. Siembieda, Timothy D. Katsiff, Blank Rome LLP, Philadelphia, PA, for Plaintiff.

Brad P. Rosenberg, Robert M. Jenkins, III, Mayer, Brown, Rowe & Maw, Washington, DC, Nancy Winkelman, Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

Presently before the Court are (1) Defendant's Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, or, in the Alternative, for Partial Referral to the Surface Transportation Board, and for a Stay Pending Resolution by the Surface Transportation Board; and (2) Defendant's Motion for a Protective Order. For the reasons set out below, the Court will deny the motion to dismiss; grant the motion to refer; grant in part and deny in part the motion for a stay; and deny the motion for a protective order.

### I. BACKGROUND

Plaintiff in this case is AT & T Communications, Inc., a telecommunications equipment and service provider. AT & T is a Delaware corporation with its principal place of business in New Jersey. Defendant is Consolidated Rail Corporation ("Conrail"), a Pennsylvania corporation with its principal place of business in

Pennsylvania. Jurisdiction is premised on diversity of citizenship. *See* 28 U.S.C. § 1332(a). This case was originally before the Honorable Bruce W. Kauffman, who held a hearing on the pending motion to dismiss on July 10, 2003. The case was subsequently transferred to the calendar of the undersigned pursuant to the Eastern District of Pennsylvania's procedure for random reassignment of cases.

Conrail and AT & T entered into a License Agreement in 1984 permitting AT & T to install fiber optic cable ("FOC") along selected portions of Conrail's right of way in return for license fees. AT & T installed the cable along approximately 2700 miles of Conrail right of way. The License Agreement contains a Most Favored Nations clause ("MFN") that guarantees AT & T will pay no more than its competitors for such limited use of specified right of way covered by the License Agreement.[1] The License Agreement term extends to January 1, 2014. As of the date of the Complaint, AT & T has paid approximately $200 million in fees, and continues to pay approximately $17 million in annual fees to Conrail. In the present action, AT & T seeks to enforce Conrail's contractual obligations under the MFN.

The issues presently before the Court arise from Conrail's 1999 merger with CSX Corporation and CSX Transportation, Inc. (collectively, "CSX"), and Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively, "NS").

In 1997, CSX and NS petitioned the Surface Transportation Board (the "STB") for approval of their acquisition of Conrail (the "Transaction"). The STB has exclusive authority to approve, authorize, and supervise railroad transactions such as sales, leases, consolidations, and mergers. 49 U.S.C. § 11321.

After providing for the required public notice, comment and hearings on the proposed Transaction Agreement, *see* 62 Fed. Reg. 39577 (July 23, 1997), in which AT & T did not participate, the STB approved the Transaction Agreement on July 23, 1998. *See CSX Corp. and CSX Transp. Inc., Norfolk Southern Corp. and Norfolk Southern Ry. Co.—Control and Operating Leases/Agreements—Conrail Inc. and Consolidated Rail Corp.*, 3 S.T.B. 196, 1998 STB LEXIS 243 (July 23, 1998) (hereinafter *"Decision No. 89"*). The STB required that the Transaction include certain conditions, and it is these conditions that gave rise to the instant dispute.

Most significantly, the STB required the creation of two subsidiaries of Conrail: New York Central Lines LLC ("NYC") and Pennsylvania Lines LLC ("PRR"). Although both new companies are subsidiaries of Conrail, CSX appoints all officers and directors of NYC, and NS appoints all officers and directors of PRR. *See id.* at *34. The STB also designed a plan for reallocation of Conrail's assets, which it grouped into three categories. "Allocated Assets" are assets that Conrail transferred

---

1. The MFN provides, in relevant part:

   CONRAIL covenants and agrees that, in the event it enters into any agreement with a party other than LICENSEE providing for the use by such party of right of way owned or controlled by CONRAIL for the installation of a FOC system between any two points on the Licensed Premises, whether such system is to be installed on the Licensed Premises or parallel to the Licensed Premises, CONRAIL will, at its option, either (i) charge such other party a per mile fee at least equal to the average per mile fee ... between such two points which LICENSEE is obligated to pay CONRAIL pursuant to this License, or, in the alternative, (ii) reduce its average per mile fee between such two points to LICENSEE to the average per mile fee charged to such other party.

   License Agreement ¶ 11.2, attached to Defendant's Motion at Ex. A.

to the sole and exclusive ownership of NYC or PRR for operation by CSX and NS. "Shared Assets" are assets that are shared by Conrail, NYC, and PRR. "Retained Assets" are assets retained solely by Conrail. *See id.* at *34–35.

The "Split Date" for the Transaction was June 1, 1999, at which time Conrail conveyed as Allocated Assets approximately ninety percent of its right of way to NYC and PRR. As a consequence, CSX and NS, respectively, operate the former Conrail railroad lines now owned by NYC and PRR, respectively.[2] Some of the quitclaim deeds state that the right of way conveyances were "subject to" the AT & T License Agreement and other FOC agreements, *see* Plaintiff's Opp. at Ex. 2, while others did not, *see* Defendant's Reply at Ex. 1.

In addition to obtaining these rights of way, CSX/NYC and NS/PRR acquired the sole right to enter into additional FOC agreements with third parties on these segments of former Conrail right of way. Although Conrail did not retain any rights to enter into new FOC agreements on divested rights of way after the Split Date, it did retain all existing contracts granting the right to bury FOC along the right of way conveyed to its new subsidiaries. *See* Transaction Agreement at § 2.2(d), attached to Plaintiff's Opp. at Ex. 1, p. 29.

Thus, the License Agreement with AT & T was a Retained Asset, and Conrail continues to receive from AT & T approximately $17 million in annual fees under the License Agreement.[3]

AT & T's Complaint alleges that Conrail has breached the MFN by entering into contracts with AT & T's competitors under which those telecommunications companies pay less than AT & T for laying FOC along the right of way covered by the License Agreement. AT & T alleges that Conrail breached its obligations under the MFN both before and after the Split Date. AT & T seeks monetary damages and declaratory relief. Conrail responds on the merits that because post Split–Date it no longer controls the rights of way conveyed to NYC and PRR, and no longer has the right to enter into FOC agreements regarding those rights of way, it has no ability and thus no duty to comply with the MFN. At the same time, it insists that it is entitled to payment of AT & T's license fees.[4]

AT & T's only specific allegation of a breach of the MFN relates to a 1996 agreement between Conrail and Qwest Communications Corp. ("Qwest"), in which Conrail permitted Qwest to install FOC along its right of way in exchange for Qwest allowing Conrail to use Qwest's cable for railroad operation-related telecom-

---

**2.** Although AT & T claims that as a result of the Transaction Conrail is largely out of the transportation business, Conrail's general counsel explained to the Court at a July 10, 2003 hearing that Conrail still operates some rail interchanges and yards, and about 1,300 miles of track. N.T. at 43:19–25.

**3.** By way of further background, counsel for Conrail noted during the July 10, 2003 hearing that there is currently pending before the STB a petition by NS and CSX to become the direct owners of NYC and PRR, which if approved would further separate them from Conrail. N.T. 19:11–22.

**4.** At the July 10, 2003 hearing, Conrail posited that it is entitled to all of the benefits of the License Agreement, but must bear none of the burdens. Conrail's counsel balked at providing an explanation of Conrail's legal position, insisting that this question goes to the merits of AT & T's claims, which have no bearing on Conrail's motion to dismiss/refer/stay the case. Conrail contends that the merits issues are properly before the STB, not this Court. *See* discussion *infra.* Near the conclusion of the hearing, Conrail's counsel shed some light on its legal argument: that this arrangement "was part of the delicate balance" constructed by the STB when it approved the Transaction. N.T. 64:18–19.

munications purposes, rather than money (the "Qwest Barter Agreement"). Post Split–Date, Conrail has no significant need for Qwest's FOC communications capacity, although NYC and PRR are in fact using portions of it. *See* N.T. 40:13–24. AT & T protests that it is paying millions of dollars in fees under the License Agreement, while Qwest is paying "virtually no consideration" for use of the same right, and that this arrangement violates the MFN.

## II. *CONRAIL'S PARTIAL MOTION TO DISMISS/REFER/STAY*

Conrail's Motion asks this Court to dismiss portions of the Complaint for lack of subject matter jurisdiction. In the alternative, Conrail moves the Court to refer certain issues to the STB for resolution. Finally, if the Court grants either form of relief, Conrail seeks a stay of the entire action pending resolution of the proceedings before the STB.

With the exception of issues related to the Qwest Barter Agreement, Conrail's motion does not relate to any of AT & T's claims based on contracts that Conrail entered *before* the Split Date. Rather, Conrail argues that AT & T's claims based on *post*-Split-Date contracts implicate Decision No. 89, and therefore must be resolved in the first instance by the STB. Specifically, Conrail's motion seeks to place before the STB three questions, summarized accordingly:

- Whether Decision No. 89 preempts AT & T's claim that Conrail breached the MFN by "disabling itself of the ability to perform its obligations" under the MFN after the Split Date;
- Whether Decision No. 89 preempts AT & T's claims arising from application of the MFN to FOC contracts entered into after the Split Date by CSX/NYC and NS/PRR;
- Whether Decision No. 89 preempts AT & T's claim arising from application of

the MFN insofar as post Split–Date ownership and operation of former Conrail right of way by CSX/NYC and NS/PRR renders Conrail's compliance with the MFN commercially impossible or impracticable.

On the same day that it filed its motion to dismiss/refer/stay, February 25, 2003, Conrail filed a petition with the STB seeking resolution of these issues.

In support of its motion, Conrail points to the STB's exclusive jurisdiction over matters that are central to the Transaction, and contends that the STB is the only forum that may decide these issues. AT & T opposes the motion, arguing that this case has nothing to do with federal regulation of railroad mergers, but is merely a commercial contract dispute over money alone, and thus does not fall within the STB's jurisdiction.

### A. Conrail's Motion to Dismiss

■ Conrail moves to dismiss portions of AT & T's Complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). Motions under Rule 12(b)(1) may challenge jurisdiction based either on the face of the complaint (*i.e.*, a "facial attack") or its existence in fact (*i.e.*, a "factual attack"). *See Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). A factual attack occurs when a party disputes the existence of certain jurisdictional facts alleged in the complaint. *Carpet Group Int'l v. Oriental Rug Imp. Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir.2000). Such is not the case here. Rather, Conrail's motion advances a facial attack, and argues that the Complaint includes allegations not properly before the Court. When considering a facial attack, the Court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of

the plaintiff. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.2000).

Conrail argues that the Court lacks subject matter jurisdiction over claims arising from the division of assets authorized by the STB. Under the Interstate Commerce Act ("ICA"), 49 U.S.C. § 11321(a), the STB has "exclusive" authority to approve rail mergers and consolidations. In addition, § 11321(a) exempts such transactions "from the antitrust laws and from all other law ... as necessary ... to carry out the transaction."[5] Conrail contends that some of AT & T's contract claims are preempted under this statutory provision.[6] Before it may reach this question, however, the Court must confront the issue presented by Conrail's motion: does this Court have jurisdiction to decide the preemption issue, or does jurisdiction over the issue rest exclusively with the STB?

Conrail relies primarily on two decisions from the Courts of Appeals in support of its position that the STB has exclusive jurisdiction over disputes that implicate the Transaction.[7] The first is the Ninth Circuit Court of Appeal's decision in *Railway Labor Executives' Ass'n v. Southern Pacific Transportation Co.*, 7 F.3d 902 (9th Cir.1993) (hereinafter "*Southern Pacific*"). There, the Interstate Commerce Commission ("ICC"), as the predecessor to the STB,[8] approved a merger of several railroad companies. Thereafter, a dispute arose between the railroad and the union over coordinating maintenance operations as part of its implementation of the merger. The railroads sought to arbitrate the dispute under the procedures imposed by

---

**5.** The statute provides, in pertinent part:

The authority of the Board under this subchapter is exclusive. A rail carrier or corporation participating in or resulting from a transaction approved by or exempted by the Board under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.
49 U.S.C. § 11321(a).

**6.** There is no question that the § 11321(a) exemption "is broad enough to include laws that govern the obligations imposed by contract." *Norfolk and Western Ry. Co. v. Am. Train Dispatchers Assoc.*, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991). AT & T conceded this point at the hearing. N.T. 25:8–13.

**7.** In addition to citing federal appellate cases, both parties argue about the significance of the STB's decision in *Consolidation Coal*

*Sales Co. v. Consolidated Rail Corp.*, Fin. D. No. 34169, 2002 STB LEXIS 317 (May 24, 2002) (hereinafter "*CCSC*"). There, Chief Judge Giles, with the mutual consent of the parties, referred to the STB a contract counterclaim arising out of a dispute over Conrail's obligations under two contracts Conrail had entered in 1991 and 1992. Conrail asserted that it was no longer able to perform certain obligations under the contracts as a result of Decision No. 89, and therefore that the contracts were preempted. The STB agreed. *See id.* at *11. However, the STB did not address the question presented here: whether a federal district court has jurisdiction to entertain such a claim. Furthermore, that the parties consented to referral to the STB, and that Chief Judge Giles ordered such referral, says nothing about the jurisdictional question.

**8.** The ICC Termination Act of 1995 abolished the Interstate Commerce Commission and transferred its remaining functions to the STB. In addition, it resulted in the renumbering of various provisions of the Interstate Commerce Act. *See Union R.R. Co. v. United Steelworkers of Am.*, 242 F.3d 458, 460 n. 1 (3d Cir.2001) (hereinafter "*Steelworkers*").

the ICC in connection with the merger. Certain railroad unions representing employees of the railroads sought a declaration in federal court that they were not required to arbitrate under those procedures, but rather were entitled to arbitrate under procedures prescribed by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et. seq.[9] The railroads argued that they were exempt from the requirements of the RLA pursuant to the exemption in § 11341 (now § 11321), and moved to dismiss for lack of subject matter jurisdiction. The district court granted the motion, concluding that the ICC had exclusive authority over the matter. See Southern Pac., 7 F.3d at 903–05.

The Ninth Circuit affirmed, and held that the question of whether § 11341 preempted the unions' claims under the RLA must be raised before the ICC (now the STB). Id. at 905–909. The court first looked to Norfolk and Western Railway Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (hereinafter "Dispatchers") in order to discern the Supreme Court's "overall conception of the statutory scheme," which it found "determinative of this case." Southern Pac. 7 F.3d at 906. In Dispatchers, the Supreme Court held that § 11341 may exempt a party, "as necessary to carry out a transaction approved by the [ICC]," from its legal obligations under an existing collective bargaining agreement, and under the RLA.

499 U.S. at 128–134, 111 S.Ct. 1156. However, Dispatchers did not resolve which forum—the ICC or a federal district court—has jurisdiction to adjudicate the applicability of the § 11341 (now § 11321) exemption.

Looking to Dispatchers and the ICA, the Ninth Circuit reasoned that (1) because the ICA grants to the ICC the exclusive authority to examine, condition and approve proposed railroad mergers, and (2) because Dispatchers makes clear that the ICC has the power to exempt parties to such mergers from any provisions of the RLA by approving that merger, it follows "that where a railroad which has been a party to an ICC-approved merger claims that certain proposed actions are incident to that merger and exempt from RLA procedures under section 11341(a), the ICC has exclusive authority to resolve a challenge to these claims." Southern Pac., 7 F.3d at 906. Turning to the case before it, the Ninth Circuit concluded:

> [B]ecause the ICC had exclusive authority to approve the ... merger and thereby exempt the Railroads from any procedural or substantive law which might otherwise impede that merger, it should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption.

Id. The Southern Pacific court found its conclusion was consistent with the objec-

---

**9.** When the STB approves a railroad transaction, it is required to impose conditions for the protection of existing and future employees from the adverse effects of the transaction. See 49 U.S.C. § 11326 (affected employees are entitled to "a fair arrangement"). In order to comply with this directive, a standard set of protective conditions, known as the New York Dock conditions, were first announced in New York Dock Railway—Control—Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60, 84–90, aff'd sub nom. New York Dock Ry. v. United States, 609 F.2d 83 (2d

Cir.1979). These conditions provide, among other things, that in the course of negotiations between a railroad and its employees over how to implement an operational change approved by the STB, either party may unilaterally take a dispute to arbitration for a final, binding determination. See Steelworkers, 242 F.3d at 460; Southern Pac., 7 F.3d at 903–04. By contrast, the RLA provides that changes to collective bargaining agreements may be arbitrated only with the mutual consent of both parties. See id. at 904 (citing 45 U.S.C. § 157).

tives that inform the exemption, which is to "promote 'economy and efficiency in interstate transportation by [removing] the burdens of excessive expenditure.'" *Id.* (quoting *Dispatchers,* 499 U.S. at 132, 111 S.Ct. 1156). The court recognized that permitting parties to litigate "the scope of an approved merger and the corresponding breadth of the section 11341(a) [exemption] ... would invite a barrage of collateral challenges to the ICC's authority." *Id.* This, the court concluded, would likely "frustrate and delay the administration of mergers in a way that section 11341(a) was clearly meant to avoid." *Id.* at 906–07; *see also id.* at 906 ("The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated.") (quoting *Dispatchers,* 499 U.S. at 133, 111 S.Ct. 1156). As to the parties before it, the *Southern Pacific* court concluded that permitting the unions to pursue their case in federal court "may serve to circumvent or frustrate the procedures which have been put in place to efficiently resolve labor disputes which arise in connection—or allegedly in connection—with a railroad merger." *Id.* at 907.

The second case primarily relied upon is the Third Circuit Court of Appeal's decision in *Union Railroad Co. v. United Steelworkers of America,* 242 F.3d 458 (3d Cir.2001) (hereinafter "*Steelworkers*"). *Steelworkers* and *Southern Pacific* arose under very similar circumstances, and, perhaps not surprisingly, reached the same result. The Third Circuit in *Steelworkers* addressed "whether a federal district court has subject matter jurisdiction to adjudicate challenges to a collective bargaining agreement, made in connection with a rail merger authorized by the [STB]." The case arose following a consolidation of rail carriers and other companies. Thereafter, the newly merged railroad sought to consolidate certain clerical work.

When negotiations with unionized employees failed, as was the case in *Southern Pacific,* the unions in *Steelworkers* claimed that the ensuing dispute over the proposed coordination of clerical workers had to be resolved under RLA procedures, not under the *New York Dock* procedures, and sought declaratory and injunctive relief to that effect in federal district court. The district court dismissed the claim for lack of subject matter jurisdiction. *See id.* at 460–62.

The Third Circuit affirmed, and agreed with the railroad that "the STB has exclusive jurisdiction to consider disputes concerning changes to labor agreements which are necessary to implement an STB-authorized consolidation." *Id.* at 463. Like the *Southern Pacific* court, the *Steelworkers* court noted that the "almost interminable process" associated with RLA negotiations was inconsistent with the ICA's goals of efficiency and economy in interstate transportation. *Id.* at 463–65 (citation omitted). It then reviewed two opinions that had addressed the same jurisdictional issue: *Southern Pacific,* as well as an analogous decision by the Fourth Circuit Court of Appeals in *Norfolk & Western Railway v. Brotherhood of Railroad Signalmen,* 164 F.3d 847, 855 (4th Cir.1998) (hereinafter "*Signalmen*").

After rejecting the unions' argument that the language and structure of the ICA makes the § 11321 exemption inapplicable to the merger at hand (an issue not presented in this case), the court emphasized that in the event of a railroad merger "the ICA puts within the exclusive jurisdiction of the STB ... the relationship between the railroad and its employees," and mandates that affected employees be protected by a "fair arrangement." *Steelworkers,* 242 F.3d at 466 (citing 49 U.S.C. §§ 11324, 11326). "All this demonstrates ... that 'to the extent that a transaction subject to the

STB's approval impacts collective bargaining agreements or the relationship between railroads and their employees, the STB has exclusive jurisdiction in the first instance to consider the issues.'" *Id.* at 467 (quoting *Signalmen,* 164 F.3d at 855).

The unions urged the Third Circuit to follow the narrower approach adopted by the Seventh Circuit Court of Appeals in *Harris v. Union Pacific Railroad,* 141 F.3d 740 (7th Cir.1998) (holding federal district court may resolve civil rights claims against merged railroad because such claims could not have effect of blocking the transaction), but the court found that case distinguishable. *See* discussion *infra.* Finally, the *Steelworkers* court concluded:

> [T]he ICA—in its language and overall statutory design—reflects Congress's commitment to a national transportation policy that favors the consolidation of railroads. And Congress has decided that such a policy is best pursued by freeing rail consolidations from the burdensome delays and expenditures associated with RLA procedures. Thus, the ICA and RLA are not complementary and co-equal statutory schemes, as the [union] proposes. The RLA must yield to the ICA when it impedes the implementation of a STB-approved consolidation. Moreover, the STB has the exclusive jurisdiction to adjudicate challenges to such an implementation.

242 F.3d at 468.

AT & T counters by distinguishing *Southern Pacific* and *Steelworkers* as cases involving Congress's special grant of jurisdiction to the STB to protect the interests of railroad employees, and its limited authority to protect employees affected by a proposed merger transaction. In addition, it relies heavily on the Seventh Circuit Court of Appeals' decision in *Harris,* 141 F.3d 740, and argues that *Harris* more resembles the instant matter.[10]

There, the court considered whether a district court may consider claims brought by two employees against a newly merged railroad, or whether the ICC had exclusive jurisdiction to resolve the claims. Like it did in *Southern Pacific* and *Steelworkers,* the ICC gave its assent to the merger subject to the standard *New York Dock* conditions. However, the ICC also permitted labor and management to negotiate an alternative set of conditions to protect employee interests affected by the merger. The parties reached such an agreement, which provided that up to 300 clerical employees could elect separation benefits in lieu of involuntary transfers or layoffs that would accompany implementation of the merger. Significantly, only employees at work when the agreement was announced were eligible, and employees on leave had to return to work within twenty days in order to be eligible. *See Harris,* 141 F.3d at 741–42.

Two employees were on maternity leave at the time the agreement was announced, and they did not return to work within twenty days. Their applications for separation benefits were denied and they brought suit, alleging, *inter alia,* sex discrimination under the federal Pregnancy Discrimination Act. The district court concluded that the ICC's approval of the merger foreclosed the plaintiffs' claims un-

---

**10.** AT & T also relies on *City of Palestine, Texas v. ICC,* 559 F.2d 408 (5th Cir.1977), but the Eleventh Circuit, following the Fifth Circuit split, expressly concluded that *Palestine* was not relevant to whether a district court has subject matter jurisdiction to entertain a preemption claim. *See Bhd. Ry. Carmen v.* *CSX Transp., Inc.,* 855 F.2d 745, 749 (11th Cir.1988) ("the subject matter jurisdiction of the district court was not at issue [in *Palestine*], so we do not find [*Palestine*] to be dispositive of the issue presently before us"). The Court agrees with the Eleventh Circuit's assessment of *Palestine.*

less the STB (as successor to the ICC) authorized the litigation. *See id.* at 742.

The Seventh Circuit reversed. While it agreed that the civil rights laws are encompassed by § 11321(a)'s exemption from "all other law," it rejected the Ninth Circuit's approach, as outlined in *Southern Pacific,* that only the ICC may determine which other laws it is "necessary" to set aside. *See id.* at 743. It noted that in approving the merger at issue in *Harris,* the ICC "did not say 'boo'" about the necessity of displacing civil rights laws in order to effectuate the merger, nor did the ICC in permitting an alternative to the *New York Dock* conditions "invite or authorize the parties to violate any laws." *Id.* The court opined that if, in the course of approving the merger, the ICC "implies (but does not quite say)" that some other law must of necessity yield, "then perhaps a court should refer the subject to the agency under the doctrine of primary jurisdiction." *Id.* Where that does not happen, the court concluded, a federal district court has jurisdiction to decide which other laws it is "necessary" to displace. *Id.* at 743 (citing *Burlington N. R.R. v. United Transp. Union,* 862 F.2d 1266, 1277–81 (7th Cir.1988)).

Turning to the facts before it, the *Harris* court concluded that it was not "necessary" to set aside the civil rights laws in order to let the railroad carry out the transaction, and necessity being the linchpin of the exemption, held that the plaintiffs' claims were not preempted. *Id.* at 743–44 ("None of the civil rights laws puts any obstacle in the way of Union Pacific's acquisition of the Chicago & North Western."). It then made the following observation about the scope of the STB's jurisdiction:

On the railroad's understanding of § 11341(a), the Board is forever in charge of all legal disputes related to a merger. Is the railroad liable to a brakeman injured by failure of a coupler on a car that came from the acquired corporation? Does an easement on any of the carrier's rights of way survive the merger? Are the employees entitled to a Christmas bonus under the labor agreement? Some of these issues are resolved by arbitration or bargaining, others under state property law or the Safety Appliance Act. . . . But if the Union Pacific were right, everything would be up for grabs. Who can tell which of these laws the Commission might have thought incompatible with the merger?

*Id.* at 744. Finally, the court concluded that if the STB approves a merger without directly or by necessary implication using its power to supersede other laws, "courts should continue to resolve disputes under generally applicable rules of law." *Id.*

AT & T contends that *Harris* illustrates the limits of the STB's jurisdiction, and asks the Court to apply the same limited view to this case. Here, it argues, the STB did not say "boo" about AT & T's License Agreement when it approved the Transaction. Thus, it contends, the Court is well within its jurisdiction to address whether the STB's authorization, as outlined in Decision No. 89, preempts AT & T's contract claims.

On the basis of *Southern Pacific* and *Steelworkers,* Conrail argues that some of AT & T's claims fall within the STB's exclusive jurisdiction because they ask this Court to "consider matters that go to the heart of the STB's approval and supervision of the CSX/NS/Conrail Transaction— and if allowed, that could greatly frustrate the goals of that Transaction." Def. Motion at 10. In doing so, Conrail engages in clear hyperbole regarding a rather close question.

First, it is not at all apparent that AT & T's claims go to the "heart" of the STB's approval and supervision of the

Transaction in the same way that the unions' claims did in *Southern Pacific* or *Steelworkers*. As those cases emphasize, the "heart" of any STB approval of a consolidation is promoting "economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure." *Dispatchers*, 499 U.S. at 132, 111 S.Ct. 1156 (quoting *Texas v. United States*, 292 U.S. 522, 534–35, 54 S.Ct. 819, 78 L.Ed. 1402 (1934)). The cases cited by Conrail—*Southern Pacific* and *Steelworkers*—set out convincingly that when a union challenges the manner in which an STB-authorized transaction is *actually carried out*, such a challenge implicates the STB decision itself, and thus places the dispute within the jurisdiction of the STB. In other words, where a party's claim seeks to affect the *actual implementation* of the transaction, such a claim goes to the heart of the STB's authority to condition and approve the transaction.

■ Conrail's efforts to analogize *Southern Pacific* and *Steelworkers* to the instant matter are ultimately unpersuasive. In fact, AT & T is not directly challenging any STB-approved action taken by Conrail. In Conrail's view, AT & T's breach of contract claim is an attack on the Transaction *itself*. That might be the case were AT & T claiming that Conrail's transfer of its right of way to PRR and NYC in and of itself gives rise directly to liability, but such is not the case here. Rather, AT & T is challenging the manner in which Conrail has allegedly cloaked itself in Decision No. 89, and used the decision as an excuse for its conduct, *i.e.*, refusing to honor its contractual obligations under the MFN. In other words, Conrail paints itself as a victim of STB-imposed circumstance, left with no choice but to continue to accept AT & T's license fees, while remaining unable to honor its obligations under the MFN. Taken in this light, it is not surprising that AT & T objects to Conrail's conduct as an illegal effort to run with the hare and hunt with the hounds.

Nor do the policy concerns at issue in *Southern Pacific* and *Steelworkers* arise in this case. Unlike the plaintiffs' claims in those cases, where the jurisdictional analysis turned so distinctly on the likely threat of "interference with the [STB's] ability to efficiently facilitate mergers," *Southern Pac.*, 7 F.3d at 906, AT & T's claims do not present the same potential threat, either in kind or degree. The plaintiffs in *Southern Pacific* and *Steelworkers* sought to avoid the procedures developed by the STB itself in carrying out its statutory mandate to protect affected employees—the *New York Dock* conditions—in favor of the RLA procedures, which were widely known to produce results in tension with the goals of the ICA as described by the Supreme Court in *Dispatchers*, 499 U.S. at 132, 111 S.Ct. 1156 (ICA was "designed to promote 'economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure'"); *id.* at 133, 111 S.Ct. 1156 ("The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated.") (citations omitted). As the Ninth Circuit recognized, this particular dispute between unions and merged railroads would arise "[a]s long as the § [11321(a)] exemption exists." *Southern Pac.*, 7 F.3d at 906. The court reasoned that allowing such inevitable controversy to proceed through the federal courts would open the floodgates to "a barrage of collateral challenges to the [STB's] authority which would be likely to frustrate and delay the administration of mergers in a way that section [11321(a)] was clearly meant to avoid." *Id.* at 906–07. No such similar concerns arise here. As such, Conrail has failed to persuade the Court that the issues presented by its contractual dispute with AT & T so clearly

threaten the Transaction or the STB's ability to effectively manage similar transactions that it is within the STB's *exclusive* jurisdiction to resolve.

Under *Southern Pacific* and *Steelworkers*, it is clear that the Court's decision on the jurisdictional issue must turn at least in part on the degree to which AT & T's claims actually challenge the implementation of the STB-approved Transaction. If they do, then the STB must address the question of whether Decision No. 89 preempts such claims in the first instance.[11]

An examination of the Complaint reveals that AT & T is perhaps overstating the matter when it argues that this case has "nothing to do with federal regulation of railroads or transportation issues." AT & T's Opp. at 1. Specifically, AT & T alleges that Conrail has breached its express and implied duties under the License Agreement by:

   c.  transferring portions of the MFN [right of way] to its wholly-owned subsidiaries (N.Y.C and Pennsylvania Lines) and then disclaiming any responsibility for subsequent agreements providing for the use of the MFN [right of way] that may violate the MFN Covenant;

   d.  transferring portions of the MFN [right of way] to its wholly-owned subsidiaries (N.Y.C and Pennsylvania Lines) and then divesting itself of the ability to perform its obligations under the MFN Covenant;

Complaint ¶ 39(c)-(d).[12] These allegations on their face do not directly implicate the Transaction, nor do they purport to create any direct obstacle to the implementation of the Transaction. AT & T is not alleging that *because* Conrail transferred portions of it right of way, it is liable to AT & T. Rather, AT & T alleges that Conrail is using the transfers as an excuse to breach the MFN. As counsel for AT & T pointed out at the hearing, it does not seek to undo the Transaction; the only relief it seeks is a reduction in fees as mandated by the MFN. N.T. 63:6–64:3. Therefore, while the Transaction plays some role in AT & T's claim, the degree to which AT & T is challenging the Transaction itself, or the STB's administration of the merger, is de minimis.[13] Accordingly, the Court con-

---

**11.** The Court declines to follow the analysis utilized by the Seventh Circuit in *Harris,* 141 F.3d 740. The Third Circuit's opinion in *Steelworkers* suggests this is the appropriate course. *See* 242 F.3d at 466–68 (following the broader approach utilized in *Southern Pacific,* 7 F.3d 902, and *Signalmen,* 164 F.3d 847, and finding *Harris* distinguishable).

**12.** *See also* Complaint ¶ 4:
Conrail also has breached the MFN Covenant, and repudiated the License Agreement, by transferring to its wholly-owned subsidiaries its interest in some or all of the right of way that is subject to AT & T's license and then disclaiming any further obligation to AT & T with respect to the transferred right of way and disabling itself of the ability to perform its obligations under the MFN Covenant.

**13.** At the hearing on Defendant's Motion, AT & T explained its intended meaning in drafting its allegations. The Court read from paragraph 39(d) of the Complaint, and asked counsel for AT & T, "You don't really mean that, do you?" Counsel responded, "No. But it's an alternative pleading, if the Court please. What we're saying—and perhaps it isn't artfully said there—what we're saying is we think Conrail can perform, we think they ought to perform." N.T. 55:9–18. The Court must draw all reasonable inferences in favor of AT & T, and in doings so finds this to be a fair reading of the Complaint. *See Gould Elecs.,* 220 F.3d at 176 (when ruling on a facial attack to court's subject matter jurisdiction, "court must only consider the allegations of the complaint ... in the light most favorable to the plaintiff"). As explained above, the Court is satisfied that AT & T is not challenging any Conrail actions specifically authorized or ordered by the STB.

cludes that it may exercise subject matter jurisdiction over AT & T's claims, and the motion to dismiss is denied.

## B. Motion to Refer Certain Issues to the STB

■ Conrail moves the Court, pursuant to 28 U.S.C. § 1336(b) and the doctrine of primary jurisdiction, to refer certain issues to the STB for resolution. Under the doctrine of primary jurisdiction, a court should refer a matter to an administrative agency for resolution "if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise." *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 220 (3d Cir.1974); *see also Puerto Rico Mar. Shipping Auth. v. Valley Freight Sys., Inc.*, 856 F.2d 546, 549 (3d Cir.1988) ("[T]he rationale of the doctrine is that the subject matter falls so squarely within the agency's domain that a court should permit the agency to initially resolve the question presented.").

■ The doctrine serves to "avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court." *Id.* The Third Circuit has cautioned, however, that courts "should not be too hasty in referring a matter to an agency ... whenever a controversy remotely involves some issue falling arguably within the domain of the agency's 'expertise.'" *MCI Tele. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1104 (3d Cir.1995) (quoting *Elkin v. Bell Tel. Co. of Pa.*, 491 Pa. 123, 420 A.2d 371 (1980)). Rather, referral is appropriate only "where the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar." *Id.* Once an issue is referred to an agency under the

doctrine of primary jurisdiction, "that agency's determination is binding upon the court and the parties ... and is not subject to collateral attack in the pending court proceeding." *Id.* at 1103. *See generally Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 67–68 (2d Cir.2002) (discussing evolution of primary jurisdiction doctrine).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The Supreme Court has emphasized, however, that the doctrine comes into play when "the reasons for the existence of the doctrine are present" and when "the purposes its serves will be aided by its application in the particular litigation." *Id.* In determining whether the doctrine applies, courts have consistently looked to the twin purposes articulated by the Supreme Court in *Western Pacific:* (1) "the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions"; and (2) "the expert and specialized knowledge of the agencies involved." *Id. See, e.g., Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000); *Pejepscot Indus. Park, Inc. v. Maine Centr. R.R. Co.*, 215 F.3d 195, 205 (1st Cir.2000); *United States v. Any and All Radio Station Transmission Equip.*, 204 F.3d 658, 664 (6th Cir.2000); *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir.1996).

Conrail argues that referral to the STB of the issues presented here is warranted in order to promote uniformity and consistency in the interpretation of Decision No. 89. Moreover, it argues, the STB has special expertise in determining the scope and effect of its decisions, and thus should be afforded an opportunity to decide whether Decision No. 89 preempts AT &

T's claims. *Cf. Pennsylvania v. Surface Transp. Bd.,* 290 F.3d 522, 530 (3d Cir. 2002) ("Where the Board is interpreting and applying conditions it has promulgated pursuant to its statutory authority, its action is accorded the highest deference."); *Nat'l Motor Freight Traffic Ass'n v. ICC,* 590 F.2d 1180, 1184 (D.C.Cir.1978) ("We accord particular deference when, as here, the subject of review is the agency's interpretation or clarification of its own order.").

AT & T responds that the Court should not refer this case to the STB because none of its claims require construction of Decision No. 89, and none of its claims require application of the STB's expertise. Rather, it argues, this is a simple contract dispute over how much money AT & T is required to pay Conrail under the License Agreement.

■ The Court will grant Conrail's motion to refer the case to the STB. First, as set forth in Part A *supra* and in the statute itself, the issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction. In addition, as the *Southern Pacific* court recognized, when the STB has the authority to approve a merger in the first place, it should be permitted to "clarify the scope of its own approval and the corresponding breadth of the section [11321] exemption." 7 F.3d at 906.

Second, the STB possesses the expertise necessary to resolve the instant dispute. As Conrail notes, the STB has studied the Transaction; entertained public comment, hearings, and arguments on the Transaction; and memorialized its approval in a lengthy, detailed document.[14] As the Supreme Court has noted, when the issue presented requires a determination

"reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly found only in a body of experts," then the issue must go first to those experts. *Western Pac.,* 352 U.S. at 66, 77 S.Ct. 161. Here, those experts reside in the STB. Given its prior investment of resources and intellectual capital in the Transaction, there can be little question that the STB possesses special expertise on whether certain issues would implicate Decision No. 89. The question of whether AT & T's claims are exempted under § 11321 begs this kind of special competence. Thus, the Court will call upon the STB's expertise to determine if AT & T's claims will, as Conrail's counsel put, disrupt the "delicate balance" inherent in Decision No. 89. N.T. 64:19.

Finally, referral is appropriate in order to avoid the danger of inconsistent rulings. As noted above, Conrail filed a petition with the STB on February 25, 2003 seeking a declaratory order regarding the preemptive effect of Decision No. 89. Thus, referral to the STB will enable that agency to adjudicate an issue within its special competence, and will remove the risk of inconsistent rulings from the STB and this Court. The motion to refer is granted.

### C.  Motion to Stay

■ Conrail moves the Court for a stay of this entire action pending resolution of its petition before the STB. It argues that a stay will prevent duplicative discovery and conserve judicial resources. AT & T opposes a stay, arguing that the STB proceeding is unlikely to involve any discovery. It contends that in the event discov-

---

**14.** The Lexis version of Decision No. 89 consists of approximately 100 pages of single- spaced, twelve-point text. *See* 1998 STB LEXIS 243.

ery becomes necessary before the STB, it suggests that Conrail could renew its stay request. Lastly, it argues that because Conrail seeks to refer only a portion of AT & T's claims to the STB, the balance of the action should proceed in this Court.

The Court discussed the issue of a stay at length in a conference with counsel, and resolution of this aspect of the case needs no elaborate explanation here. The Court will stay a portion of this case pending resolution of those issues referred to the STB.

An appropriate Order follows.

### ORDER

**AND NOW,** this 29th day of September, 2003, the Court hereby enters the following rulings:

I.  Upon consideration of Defendant's Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction, or, in the Alternative, for Partial Referral to the Surface Transportation Board, and for a Stay Pending Resolution by the Surface Transportation Board [Doc. # 5], Plaintiff's Opposition thereto [Doc. # 14], Defendant's Reply [Doc. # 16], after a July 10, 2003 hearing on the record [Doc. # 28], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART.** It is specifically **ORDERED** that:

A.  Defendant's Partial Motion to Dismiss is **DENIED;**

B.  Defendant's Motion for Partial Referral is **GRANTED;**

C.  Defendant's Motion to Stay is **GRANTED IN PART** and **DENIED IN PART.**

It is further **ORDERED** that:

i.  The parties are hereby granted leave to conduct discovery regarding all issues arising out of contracts entered between January 1984 and June 1999;

ii.  All discovery relating to contracts entered between June 1999 and the present is hereby **STAYED** pending further Court Order, except to the extent such discovery is requested by the Surface Transportation Board in aid of its determination of the preemption issue.

II.  It is further **ORDERED** that the Court hereby **REFERS** to the Surface Transportation Board the following specific questions:

A.  Whether the Surface Transportation Board's ("STB") Decision approving the CSX/NS/Conrail Transaction ("Decison No. 89") preempts any claim that Conrail breached the MFN clause in the FOC License Agreement by "disabling itself of the ability to perform its obligations" under the MFN clause after the "Split Date" of June 1, 1999.

B.  Whether Decision No. 89 preempts any claim against Conrail arising from the application of the MFN clause in the FOC License Agreement to fiber optic contracts separately entered into by CSX/NYC and NS/PRR, including any subsidiaries of those entities, regarding former Conrail lines after the Split Date.

C.  Whether Decision No. 89 preempts any claim against Conrail arising from the application of the MFN clause in the FOC License Agreement insofar as the ownership and operation of former Conrail right of way by CSX/NYC and NS/PRR after the Split Date renders Conrail's compliance with that clause commercially impossible or impracticable.

The STB shall advise the Court of its answer to these questions within ninety (90) days of the date of this Order, or within such longer time period as the Court may allow upon application of the STB. Plaintiff and Defendant are hereby **ORDERED** to make all reasonable efforts to assist the STB in resolving these questions as expeditiously as possible.

III. Upon consideration of Defendant's Motion for a Protective Order [Doc. # 20], Plaintiff's Memorandum in Opposition thereto [Doc. # 26], and Defendant's Reply [Doc. # 35], it is hereby **ORDERED** that Defendant's Motion is **DENIED.**

It is so **ORDERED.**